**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| H2O Resources, LLC, a Delaware Limited Liability Company | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. |
| Oilfield Tracking Services, LLC, a Pennsylvania Limited Liability Company   ; Carrizo Oil & Gas, Inc., a Texas corporation; Drew Gladulich, an Individual; Thomas Gladulich, an Individual Thomas Wilkerson, an Individual; | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, H2O Resources, LLC, by and through its counsel hereby files its Complaint against Defendants Oilfield Tracking Services, LLC; Carrizo Oil & Gas, Inc.; Drew Gladulich; Thomas Gladulich; and Thomas Wilkerson; and alleges, as follows:

## PARTIES

1.      H2O Resources, LLC ("H2O Resources" or "Plaintiff") is a Delaware Limited Liability Company with its principal place of business in Edmond, Oklahoma. H2O Resources, LLC is registered to do business in Pennsylvania, and is doing business in Pennsylvania under the name Water Trac, L.L.C.

2.      H2O Resources is involved in the business of water data tracking and water data management, primarily associated with fresh water and waste water produced and used during oil and gas production.

3.      The sole member of H2O Resources is Mr. Charles Keith, an individual residing in Edmond, Oklahoma. Charles Keith is and has been, and at all relevant times, the president of H2O Resources. Charles Keith is the sole remaining employee of H2O Resources.

4.      Oilfield Tracking Services, LLC ("OTS") is a Pennsylvania Limited Liability Company with its principal place of business in Warminster, Pennsylvania.

5.      OTS is a software development and application company that develops cloud-based platforms to streamline oil and gas operations.

6.      OTS was organized as a limited liability company on May 20, 2013. The founding and sole current members of OTS are Thomas Gladulich and Drew Gladulich.

7.      Carrizo Oil & Gas, Inc. ("Carrizo") is a Texas corporation with its principal place of business in Houston, Texas.

8.      Carrizo is an energy company engaged in the exploration, development, and production of oil and gas from locations within the United States.

9.      Drew Gladulich is an individual residing in Newark, Delaware. Drew Gladulich is and has been, at all relevant times, Vice President of OTS.

10.     During all relevant times, Drew Gladulich was also an employee of Carrizo, who traveled to and worked at Carrizo's various United States locations. In his capacity as an employee of Carrizo, Drew Gladulich was given the responsibility of monitoring H2O Resources' WaterTRAC database on behalf of Carrizo. Upon information and belief, Drew Gladulich is currently employed as the Water and Waste Technical Director of Carrizo.

11.     Thomas Gladulich is an individual residing in Lansdale, Pennsylvania. Thomas Gladulich is and has been, at all relevant times, Chief Executive Officer of OTS.

12.    Thomas ("Tommy") Wilkerson is an individual residing in Houston, Texas. During all relevant times, Tommy Wilkerson was an employee of Carrizo. In his capacity as an employee of Carrizo, Tommy Wilkerson was given the responsibility of supervising the management of all water used or produced in association with Carrizo's oil development and production efforts throughout the United States, including those in Pennsylvania, Ohio, and Texas. Upon information and belief, Tommy Wilkerson is currently employed as the Water, Drilling, and Water Transportation Manager of Carrizo.

13.    For purposes of this Complaint, (a) Carrizo and OTS are collectively referred to as the "Company Defendants," (b) Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson are collectively referred to as the "Individual Defendants," and (c) Individual Defendants and Company Defendants are collectively referred to as "All Defendants."

## NATURE OF THE ACTION

14.    This action arises under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et. seq.*, to recover damages directly resulting from a scheme devised by All Defendants to defraud H2O Resources and misappropriate from H2O Resources its trade secrets, proprietary data and confidential information for the purpose of developing a new oilfield water tracking company and a new competing oilfield tracking system to drive H2O Resources out of the market. H2O Resources also seeks damages for violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et. seq.*; violations of the Pennsylvania Uniform Trade Secret Act, 12 P.S. § 5301, et seq.; fraud and deceit; violations of the Oklahoma Deceptive Trade Practices Act; civil conspiracy; unfair competition; conversion and misappropriation of business and confidential information; and unjust enrichment.

15.    The Individual Defendants are employed by either or both of the Company Defendants.

16.    The Company Defendants, acting in conjunction with the Individual Defendants, engaged in unlawful conduct from approximately May 2013 to the present.

17.    All Defendants, conspiring together and with great aforethought and malice, orchestrated a scheme to defraud H2O Resources of its trade secrets, proprietary data and confidential information through an abuse of confidence and deceit to obtain H2O Resources' enhanced water tracking data, trade secrets, and confidential and proprietary information. In particular, the All Defendants were able to, through an abuse of confidence and deceit, access and misappropriate H2O Resources' protected business information and trade secrets solely for the business purposes of All Defendants' own enterprise.

18.    All Defendants, conspiring together, have used H2O Resources' enhanced water tracking data, trade secrets, and confidential and proprietary information to develop a competing oilfield water tracking product and company, which All Defendants have then used to directly compete with H2O Resources, by eliminating Carrizo's need for the H2O Resources WaterTRAC platform, and also attempting to take and taking other potential business from H2O Resources, which has in turn, destroyed H2O Resources' business.

19.    All Defendants' conduct was part of their 2014 expressed ultimate goal of creating a new industry standard for oilfield water tracking, and in turn, to eliminate, or at least aggressively compete with H2O Resources' WaterTRAC platform in the industry, in an effort for All Defendants to take control of H2O Resources' market share.

20.    In acting and conspiring to defraud H2O Resources of its trade secrets, proprietary data and confidential information, through an abuse of confidence and deceit, and

misappropriating those trade secrets and information for their own benefit, All Defendants have violated the RICO Act, 18 U.S.C. §§ 1961, *et. seq.*, and the DTSA, 18 U.S.C. §§ 1836, *et. seq.*, Pennsylvania Uniform Trade Secrets Act, 12 P.S. § 5301 *et. seq.*, and committed numerous Oklahoma and Pennsylvania state law torts.

21.     H2O Resources has been required to spend a tremendous amount of time and effort, including a review of former employees email accounts, a review of the WaterTRAC database user logs, and witness interviews in order to discover the truth and obtain evidence of All Defendants' wrongdoing, conspiracy, and continuing actions.

22.     All Defendants' conduct has caused H2O Resources great financial harm, and in fact, it has caused the end of H2O Resources' business due to a lack of business. All Defendants' conduct has also caused harm associated with the loss of H2O Resources confidential information, trade secrets, loss of goodwill, and other harm.

23.     H2O Resources seek actual, punitive, and statutory multiplied damages against All Defendants.

## **NON-PARTY WITNESSES**

24.     Mary Gilstrap is an individual residing in Evan City, Pennsylvania. At all relevant times, Mary Gilstrap was employed by and the Head of Operations and Environment of H2O Resources. While employed by H2O Resources, Mary Gilstrap was responsible for operations, including sales, setting up customers' sites, and overseeing the day to day operations of all H2O Resources' employees both in the field as well as in the monitoring center (where database management and auditing of the water tracking data collected from various oilfields in the United States was conducted).

25.     Brian Bagby is an individual residing in Plano, Texas. Brian Bagby was at all relevant times an employee of H2O Resources. Mr. Bagby was the Head of Development and Marketing of H2O Resources. While at H2O Resources Mr. Bagby was responsible for prospecting, scoping, proposal generation, presentations, legal, payroll, accounts payable, accounts receivable, cash management, appearing at trade shows, administering H2O Resources' website, and collecting receivables.

26.     Gerald ("Jerry") Murphy is an individual residing in Kimbolton, Ohio. From 2011 to 2014, Jerry Murphy was an H2O Resources employee. Mr. Murphy serviced H2O Resources' WaterTRAC water tracking equipment installed at Carrizo's Pennsylvania and Ohio operations. Upon information and belief, Mr. Murphy is currently employed by Carrizo as a Drill Solids and Water Superintendent.

27.     Herb Pavelka is an individual residing in Bryan, Texas. From 2012 to 2016, Herb Pavelka was an H2O Resources employee. Mr. Pavelka serviced electrical components for H2O Resources' WaterTRAC water tracking equipment installed at Carrizo's South Texas operations. As will be shown after a reasonable opportunity for discovery, Mr. Pavelka is currently employed by Carrizo as an electrician.

28.     Michael Wilkerson is an individual residing in Lafayette, Louisiana. From 2014 to 2016, Michael Wilkerson was an H2O Resources employee. Michael Wilkerson assisted Mr. Pavelka in servicing the electrical components for H2O Resources' WaterTRAC water tracking equipment installed at Carrizo's South Texas operations.

29.     Jeremy V. Manno is an individual residing in State College, Pennsylvania. At all relevant times, Jeremy Manno was the Infrastructure Design Coordinator of Carrizo.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction of this action under 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 1331, 1332(a), 1337 and 1367.

31.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the Complaint includes claims arising under the laws of the United States, specifically, claims for violations of the RICO Act pursuant to 18 U.S.C. § 1961, *et. seq.* and for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et. seq.*

32.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over H2O Resources' state law claims.

33.     This Court has additional subject matter jurisdiction of this action under 28 U.S.C. § 1332(a). As identified above there is complete diversity between the Plaintiff and the All Defendants and the amount in controversy exceeds $75,000 in value, exclusive of interest and costs.

34.     This Court has personal jurisdiction over OTS pursuant to 18 U.S.C. § 1965(b)'s authorization of service of process on OTS in any district for actions brought under 18 U.S.C. § 1964 and pursuant to 42 Pa. C.S.A. § 5301(a)(3) because of its formation as a limited liability company under the laws of the Commonwealth of Pennsylvania and because it carries on a continuous and systematic part of its general business within the Commonwealth of Pennsylvania.

35.     This Court has personal jurisdiction over Carrizo pursuant to 18 U.S.C. § 1965(b)'s authorization of service of process on Carrizo in any district for actions brought under 18 U.S.C. § 1964, pursuant to 42 Pa. C.S.A. § 5301(a)(2)(i) because of Carrizo's qualification as a foreign corporation under the law of the Commonwealth of Pennsylvania, and pursuant to 42

Pa. C.S.A. § 5322(a) because Carrizo maintains sufficient minimum contacts with the Commonwealth of Pennsylvania and can reasonably foresee being hailed into this Court for at least the reasons that Carrizo has transacted business in the Commonwealth contracted to supply services in the Commonwealth; and has caused harm or tortious injury by acts and/or omissions both within and outside the Commonwealth of Pennsylvania.

36.     This Court has personal jurisdiction over Drew Gladulich pursuant to 18 U.S.C. § 1965(b)'s authorization of service of process on Drew Gladulich in any district for actions brought under 18 U.S.C. § 1964 and pursuant to 42 Pa. C.S.A. § 5322(a) because Drew Gladulich maintains sufficient minimum contacts with the Commonwealth of Pennsylvania and can reasonably foresee being hailed into this Court for at least the reasons that he is an officer of a limited liability company organized under the laws of the Commonwealth of Pennsylvania, has transacted and engaged in business in the Commonwealth, contracted to supply services in the Commonwealth, and has caused harm or tortious injury by acts and/or omissions both within and outside the Commonwealth of Pennsylvania.

37.     This Court has personal jurisdiction over Thomas Gladulich pursuant to 18 U.S.C. § 1965(b)'s authorization of service of process on Thomas Gladulich in any district for actions brought under 18 U.S.C. § 1964 and pursuant to 42 Pa. C.S.A. § 5301(a)(1) because he is domiciled in the Commonwealth of Pennsylvania.

38.     This Court has personal jurisdiction over Tommy Wilkerson pursuant to 18 U.S.C. § 1965(b)'s authorization of service of process on Tommy Wilkerson in any district for actions brought under 18 U.S.C. § 1964 and pursuant to 42 Pa. C.S.A. § 5322(a) because Mr. Tommy Wilkerson maintains sufficient minimum contacts with the Commonwealth of Pennsylvania and can reasonably foresee being hailed into this Court for at least the reasons that

he has transacted and engaged in business in the Commonwealth, and has caused harm or tortious injury by acts and/or omissions both within and outside the Commonwealth of Pennsylvania.

39.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2)-(3) because a substantial part of the events giving rise to the claims occurred in this district and because all defendants are subject to the Court's personal jurisdiction.

40.     Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a)-(b) because at least each of Defendants OTS, Carrizo, Drew Gladulich, and Thomas Gladulich reside, is found, has an agent, or transacts affairs in this district and the ends of justice require that Defendant Tommy Wilkerson be summoned to this district.

## FACTS

## H2O Resources' Business

41.     Due to government regulations in various states, including Ohio, Pennsylvania, and Texas in the 2000s, water produced during the removal of oil and gas from the ground (often called "produced water") must be collected and disposed of into approved water disposals. The regulations of the various states also require that the amounts of produced water created and disposed be closely monitored to discourage dumping, contamination, and pollution.

42.     In light of these state governmental regulations, H2O Resources began developing its preliminary WaterTRAC platform in 2008 after receiving confirmation from regulatory bodies in various states that they would be willing to accept electronically gathered water tracking data.

43.     H2O Resources was a leader in selling water data management services. Among other things, H2O Resources provided equipment, services, and access to its WaterTRAC

platform to various oil and gas production companies. H2O Resources' WaterTRAC is an oilfield water tracking system that helped oil and gas producing companies manage the large volume of water produced and used during the process of removing oil and gas from the ground.

44.    H2O Resources' first commercial application of its WaterTRAC platform was released to the public in late 2009. Since its first release, H2O Resources continued to develop, improve, and build-out its WaterTRAC platform.

45.    In all, H2O Resources invested millions of dollars developing its WaterTRAC platform. The WaterTRAC platform included: (1) the WaterTRAC hardware, such as data collection units (*i.e.*, an automated flow meter and associated GPS-device, radio transmitter, and antenna) that collect and transmit raw data (*i.e.*, a unique identifier of the data collection unit ("DCU"), geo-location (latitude & longitude) of the DCU, time, and water volume), (2) the WaterTRAC database, a secure relational database, which collected and stored the raw data in an organized manner (*i.e.*, "organized data"), and (3) WaterTRAC event processing software, which further operated on the raw data to create enhanced water tracking data, which was also stored in the WaterTRAC database. The raw data in the WaterTRAC database would have been sufficient for H2O Resources' clients to pull reports, produce bills of lading, and produce state regulatory reports.

46.    H2O Resources also invested heavily in the continual servicing and maintenance of its WaterTRAC platform.

47.    Prior to H2O Resources' development of the WaterTRAC platform, the oil and gas industry struggled to manage the data related to the use of high volumes of water produced and used during hydraulic fracturing operations. Such prior water tracking processes were paper-based, labor intensive, time consuming, and slow because the relevant data was pulled from

many sources, including truck driver manifests, trucking company accounting, invoicing, producers record keeping, accounts payable, regulatory reports, and record archiving. As such, it was nearly impossible to audit or review a particular past event.

48.    In 2010, H2O Resources contracted with its first client for services related to the WaterTRAC platform.

49.    A typical scope of services provided by H2O Resources relating to the sale of WaterTRAC platform services included: (1) the installation, maintenance, and service of the WaterTRAC hardware, (2) automated flow metering, (3) electronic field mapping and geo-fence design of water collection locations, (4) real-time raw data transmission to the WaterTRAC database, (5) database management, (6) formatting data for submission to governmental regulatory agencies, (7) consulting on the regulatory requirements for the client's operational areas, (8) alerts relating to various tracking parameters, (9) retention of water tracking data, and (10) user-training and WaterTRAC database access for a limited number of authorized employees of H2O Resources' clients.

50.    In general, H2O Resources' fully developed WaterTRAC platform was capable of tracking fresh and produced water through a series of water meters, GPS trackers, and antennas to transmit the client's raw data (*e.g.*, water volume and location) to the WaterTRAC database through the internet, organize that raw data through H2O Resources' proprietary WaterTRAC event processing software, and store that organized and enhanced water tracking data in H2O Resources' WaterTRAC database.

51.    Where tanker trucks were being used by clients to transport water, the WaterTRAC hardware designed and installed by H2O Resources tracked the water from pick-up to drop-off using the volume of the truck and the GPS-determined locations (at pick-up, drop-off,

and in between), and then transmitted that raw data to the WaterTRAC database through the internet, where H2O Resources' proprietary WaterTRAC event processing software processed and organized that raw data and the WaterTRAC database stored that processed and enhanced water tracking data.

52.    Where pipelines were being used by clients to transport the fresh and produced water, the WaterTRAC hardware tracked the water while it traveled through the pipeline using a series of water meters, and then transmitted that raw data to the WaterTRAC database through the internet, where the raw data was processed and organized using H2O Resources' proprietary WaterTRAC event processing software and the WaterTRAC database stored that processed and organized data.

53.    One particular benefit of H2O Resources' WaterTRAC platform is that it employed a near real-time method for collecting, recording, analyzing, and reporting information involved in the gathering, collection, and movement of fresh and produced water materials from its acquisition point to its point of delivery/disposal, which was impossible when the oil and gas companies were tracking water movements on paper.

54.    The WaterTRAC database and proprietary event processing software were both hosted on a computer server physically located in Oklahoma City, Oklahoma and leased by H2O Resources. The enhanced water tracking data stored in the WaterTRAC database was recorded on a client-by-client basis, and could be accessed on a client-by-client basis from the Oklahoma-based server through the internet by each client's authorized personnel.

55.    As part of its sale of WaterTRAC platform services, H2O Resources provided trained field employees to install and maintain the WaterTRAC hardware.

56.     As part of its sale of WaterTRAC platform services, H2O Resources also provided employees who (1) monitored and tracked H2O Resources' WaterTRAC event processing software, (2) audited the WaterTRAC database to identify any potentially significant deviations in the data and/or the need to manually update same, (3) communicated with H2O Resources' clients about those potential significant deviations and potential need to manually update database entries, and (4) manually updated the WaterTRAC database as may be indicated based on the communications with the clients.

57.     As one example of a potential deviation, if a H2O Resources' employee monitoring the EPS portal identified that a truck took 45 minutes at 10:00 am on Monday morning to transport and deliver produced water from point A to point B, when that same truck had previously averaged 30 minutes between point A and B at 10:00 am on Monday morning, H2O Resources would bring that potential deviated data point to the attention of the relevant client.

58.     As one example of a manual database update, when water was fed into storage tanks (in contrast to trucks or pipelines), customers would need to communicate with H2O Resources' employees whether the water was being deposited into or withdrawn from those storage tanks. With that additional information, H2O Resources' employees would make any necessary modifications/updates to the raw data already collected in the WaterTRAC database.

59.     Every company that purchased H2O Resources' services was also provided the ability to access the WaterTRAC database. In furtherance of this benefit, the company was allowed to identify and authorize certain individuals within their company to access their company's water tracking data in the WaterTRAC database. Generally, individuals would use the WaterTRAC database to periodically pull reports based on the water tracking data for

internal or external reporting purposes. H2O Resources would answer questions about the enhanced water tracking data and WaterTRAC database to assist the authorized individuals in understanding their company's water tracking data.

60.     Prior to gaining access to H2O Resources' WaterTRAC database, each authorized user was emailed and required to review and accept H2O Resources' Legal and Privacy statement (attached hereto as Exhibit "A"), which stated, in part (emphasis in original):

> "You are entitled to view copy and print any documents from this database but only for your own internal business purposes. You acquire absolutely no rights or licenses in or to the database or materials contained with the database other than the limited right to use the database in accordance with this Legal and Privacy Statement. Any sale, transmission or redistribution of this database or its content, and any copying, modification or other use of this database or its content for any purposes other than your own internal business purposes, are strictly prohibited. **All present and further right in and to trade secrets, trademarks, service marks, copyrights and other proprietary rights under the laws of any domestic or foreign governmental authority (the "Intellectual Property Rights") shall at all times be and remain the sole and exclusive property of H2O Resources, LLC.** Except as specifically permitted by the terms of this Legal and Privacy Statement, you shall not use the Intellectual Property Rights or the database, or any derivations thereof, for any purpose, with H2O Resources, LLC's prior written approval.  You agree to protect the proprietary rights of H2O Resources, LLC . . ."

61.     Each user of the WaterTRAC database was also provided with a unique username and password that they needed to use each time they accessed the WaterTRAC database, and prior to gaining access into the database, they were required to once again review and approve the Legal and Privacy Statement which would be present on the home login screen.

### H2O Resources' Relationship with Carrizo

62.     In late 2011, Tommy Wilkerson hired H2O Resources to provide services to Carrizo. In particular, Carrizo wanted H2O Resources to monitor fresh water movements through

Carrizo's pipeline in its Pennsylvania operations and to assist in the creation of the detailed regulatory reports for fresh water as required by the Commonwealth of Pennsylvania.

63.     Carrizo subsequently expanded its relationship with H2O Resources. At first, Carrizo expanded its use of the H2O Resources' services to monitor the movement of fresh and produced water by truck in association with its Pennsylvania operations. By late 2012, H2O Resources' services were also used in association with Carrizo's pipeline operations south of San Antonio, Texas. By the end of 2013, H2O Resources' services were further deployed for use with Carrizo's pipeline operations in the State of Ohio.

64.     H2O Resources and Carrizo entered into a Master Services Agreement in late 2011 ("2011 MSA").

65.     Beyond the original MSA, there was also an MSA executed in 2014 between H2O Resources, LLC and Carrizo (Eagle Ford) LLC (a wholly owned subsidiary of Carrizo formed to develop Carrizo's oil and gas resources in and about the Eagle Ford Shale in South Texas) ("2014" MSA"). The 2014 MSA also covered affiliates of Carrizo (Eagle Ford) LLC, which would have included Carrizo.

66.     Both MSAs contained a requirement that a dispute, claims or controversy that "arises out of or is related to this contract" (or, in the 2014 MSA, "arises out of, in connection with, or results from the performance of this agreement") or the breach thereof" be mediated and then subjected to binding arbitration. However, none of the factual underpinnings of the present claims fall within the type of disputes that the parties consented to submit to arbitration. In fact, the parties' joint intention to exclude the facts at issue here from arbitration is demonstrated by the arbitration clauses, which each specifically require that any arbitration be conducted before an arbitrator "who shall have expertise in the subject matter of this contract." An arbitrator with

expertise in the subject matter of these MSAs would provide no advantage in the context of the present Complaint further highlighting the non-arbitrability of the present claims.

67.    Moreover, a significant portion of the facts underlying the present claims fall well outside of the scope of the work or services provided under any and all of the MSAs between H2O Resources and Carrizo. Specifically, employee access to the WaterTRAC database and internet-based WaterTRAC software was not within the scope of the MSAs.

68.    As allowed by the MSAs, a separate agreement, the H2O Resources Legal and Privacy Statement (see Exhibit "A"), controlled the access and limitations of use on any Carrizo authorized user of the WaterTRAC database. Specifically, Section 1 of both the 2011 and 2014 MSAs, had no restrictions regarding additional agreements that were outside the scope of the work and services contemplated by each MSA.

69.    In accordance with H2O Resources Legal and Privacy Statement (see Exhibit "A"), designated employees of Carrizo were provided with access to Carrizo's raw water tracking data as well as the enhanced water tracking data stored in the WaterTRAC database solely for Carrizo's own internal business purposes (*i.e.* tracking fresh and produced water associated with oil and gas production).

70.    The 2011 and 2014 MSAs include confidentiality clauses which indicate that "[a]ll documents, reports, memoranda, and all information whatsoever prepared by [H2O Resources] for the account of [Carrizo] shall remain the proprietary property and information of [Carrizo]." As such, Carrizo owns all of its raw water tracking data and any reports generated with that data, neither of which are at issue in the present Complaint. The confidentiality clauses do not provide Carrizo, however, with any rights to H2O Resources' WaterTRAC database, WaterTRAC event processing software, or enhanced water tracking data derived from the use of

the WaterTRAC event processing software on Carrizo's raw water tracking data. Moreover, the confidentiality clauses do not provide Carrizo with any rights to H2O Resources' confidential, proprietary information provided to Carrizo merely to explain the workings of the WaterTRAC database, H2O Resources' event processing software, or the enhanced water tracking data in order for Carrizo to understand and confirm the validity of the raw water tracking data.

71.     Over the course of its relationship with Carrizo, approximately fifteen Carrizo employees were granted access to the WaterTRAC database by H2O Resources. At first, in February 2012, Carrizo employees Tommy Wilkerson, Jeremy Manno, Jessie Bonnice, and Bryan Jayne, were identified as authorized users and granted access by H2O Resources to the WaterTRAC database. More Carrizo employees were subsequently identified by Carrizo and provided access by H2O Resources, including Drew Gladulich, on or about September 17, 2013.

72.     Each authorized Carrizo user had to first read and accept H2O Resources' Legal and Privacy Statement (see Exhibit "A") prior to being granted access to the WaterTRAC database. Once H2O Resources provided a unique username and password for the WaterTRAC database, the authorized user would have kept those computer credentials until their authorizing client notified H2O Resources that they were no longer authorized or that H2O's relationship with the authorizing client had been terminated, whichever came first.

73.     Drew Gladulich's computer credentials were used to access H2O Resources' WaterTRAC database more often than the credentials issued by H2O Resources to the other Carrizo users.

### Tracking Carrizo's Pennsylvania, Truck-Based Fresh
### and Produced Water Operations

74.     Sometime in or around September 2013, Carrizo first introduced Drew Gladulich to H2O Resources during an in person meeting between Tommy Wilkerson (Carrizo) and Mary Gilstrap (H2O Resources).

75.     In particular, Tommy Wilkerson went out of his way during the meeting to ensure that Mary Gilstrap knew that Drew Gladulich was a Carrizo employee and that Drew Gladulich was coming from another Carrizo position to work on water tracking for Carrizo's Pennsylvania operations.

76.     So, when Tommy Wilkerson asked Mary Gilstrap to give Drew Gladulich full access to Carrizo's data in the WaterTRAC database, H2O Resources would have sent Drew Gladulich its Legal and Privacy Statement via e-mail, (see Exhibit "A"), which Drew Gladulich would have had to assent to, in order access Carrizo's raw data in the WaterTRAC database.

77.     Following Drew Gladulich's acceptance of the H2O Resources Legal and Privacy Statement, the computer credentials issued to Drew Gladulich by H2O Resources were used to access H2O Resources' WaterTRAC database nearly every day.

78.     Drew Gladulich also requested training from H2O Resources on various functions of the WaterTRAC database. From late 2013 to 2014, in a series of telephone calls between Mary Gilstrap and Drew Gladulich, Drew Gladulich asked questions regarding various basic aspects of the WaterTRAC database, including how to get in the database, how to access information, and how to download the information from the WaterTRAC database.

79.     Every few months, from 2013 to 2015, Drew Gladulich would also ask Mary Gilstrap detailed questions either over the telephone or in person about the enhanced water tracking data in the WaterTRAC database.

80.     During these calls (which unbeknownst to H2O Resources may have involved other individuals on Drew Gladulich's end of the call) and other meetings with H2O Resources' employees (and especially Mary Gilstrap), Drew Gladulich held himself out as "just a business person" with no understanding of technology, including no knowledge relevant to understanding the WaterTRAC database.

81.     As a result of Drew Gladulich's representations, Mary Gilstrap often provided Drew Gladulich with additional information to assist in his understanding of the WaterTRAC database and the underlying WaterTRAC event processing system used to create the enhanced water tracking data found in the WaterTRAC database. Occasionally, Mary Gilstrap would even provide Drew Gladulich with confidential, proprietary information about the H2O Resources' WaterTRAC system because she believed that Drew Gladulich needed this information for Carrizo's internal benefit.

82.     By early 2014, Drew Gladulich began to feign problems with the Carrizo data that had been gathered by H2O Resources' system and reported in the WaterTRAC database.

83.     H2O Resources believed this was an attempt by Drew Gladulich to discredit H2O Resources, but had no idea at that time what could have been motivating Drew Gladulich's attacks on their system and WaterTRAC platform. Because Mary Gilstrap believed that Drew Gladulich had no technical background, she provided him with even more information to ensure that he fully understood why his allegations that there were problems with the WaterTRAC system and database were mistaken.

84.     In particular, on three or four occasions over the first few months of 2014, Mary Gilstrap was summoned by Drew Gladulich to speak in person or over the telephone to defend allegedly erroneous WaterTRAC measurements. On each occasion, Drew Gladulich would

suggest there were problems with the WaterTRAC platform and/or the data stored in the WaterTRAC database by identifying alleged discrepancies between the data collected through the use of the WaterTRAC platform and other "third-party" measurement sources and would then demand an explanation of H2O Resources' system, data, and collection methods.

85.    In response, in some instances, to fully disprove Drew Gladulich's unfounded accusations, Mary Gilstrap was pressured into providing confidential and proprietary details about H2O Resources' WaterTRAC hardware, system, and database.

86.    In another example, Mary Gilstrap provided confidential and proprietary details to Drew Gladulich about the H2O Resources' data collection units ("DCUs"), specifically relating to the calibration and placement characteristics of its WaterTRAC platform water meters. As an example, Mary Gilstrap explained that the WaterTRAC platform water meters were calibrated on a specific schedule, whereas hydraulic fracturing companies and water service companies had no reason to calibrate their meters on that schedule because those companies were not responsible for tracking water, and did not need to ensure flow meter accuracy. As another example, Mary Gilstrap explained to Drew Gladulich that H2O Resources' water tracking meters were placed at specific types of locations along a pipeline because H2O Resources had discovered that those locations allowed for better and more accurate monitoring of water volumes.

87.    In some instances, Drew Gladulich's attacks on the H2O Resources' system and data drew in Tommy Wilkerson.

88.    In one instance, also in early 2014, Tommy Wilkerson demanded via telephone that H2O Resources audit the water tracking movements of a particular hydraulic fracturing job.

89.    After that hydraulic fracturing job, Mary Gilstrap reviewed all of the pertinent water movements using the data in the WaterTRAC database. Mary Gilstrap recognized that a

few of the water transfers were not classified correctly in the database and corrected those classifications as part of her audit (*i.e.*, some movements were classified as drop-offs, when they were in fact pick-ups) due to her confidential, proprietary knowledge of the H2O Resources' water location naming logic.

90.     Mary Gilstrap presented the results to Tommy Wilkerson and Drew Gladulich at an in-person meeting. Mary Gilstrap pointed out that a few transfers were incorrectly initially classified in the WaterTRAC database, which she corrected in her audit as would have been done as part of H2O Resources' normal review of data in the WaterTRAC database.

91.     In another example from early 2014, in a telephone conversation between Mary Gilstrap, Drew Gladulich, and whoever was with him, Drew Gladulich demanded that Mary Gilstrap audit the movement of Carrizo water based on a Carrizo "QA Sheet".

92.      Upon reviewing the QA Sheet, Mary Gilstrap recognized that the data was incorrect and attempted to discover why. Mary Gilstrap quickly discovered that the water was initially deposited into a Carrizo storage tank that had never been assigned a logical name location within H2O Resources' WaterTRAC platform and that water was then subsequently deposited into a truck, which was being properly tracked by the WaterTRAC platform. As a result, the data in the WaterTRAC database made it appear as if the water had moved from the "tracked" truck into the "untracked" storage tank, which is the more probable direction for the water flow under those circumstances. However, the Carrizo QA Sheet Mary Gilstrap had now been provided by Drew Gladulich told her the opposite movement was actually correct.

93.     Mary Gilstrap explained to Drew Gladulich that while the initial data in the WaterTRAC database was incorrect, it would have been corrected as part of H2O Resources' standard operating procedures. In this instance, H2O Resources and Carrizo personnel had not

yet communicated about this particular water transfer, and thus, it would not have been corrected until after that communication took place.

94.    In another more egregious example, during a telephone call in 2014 between Mary Gilstrap and Drew Gladulich, and whomever else may have been present at his end of the telephone, Drew Gladulich demanded that Mary Gilstrap explain the logic behind H2O Resources' naming of water locations in the WaterTRAC database, in order to defend concerns Drew Gladulich raised regarding the accuracy of H2O Resources' data. More specifically he wanted to know how H2O Resources was able to identify whether a particular water tracking location was a water pull (pick up) or deposit (drop off/disposal).

95.    Mary Gilstrap's explanation of H2O Resources' location naming logic provided Drew Gladulich with information unknown to even other H2O Resources' customers and provided him the ability to understand the power of that naming logic.

96.    H2O Resources' location naming logic underlies H2O Resources' organization of raw data in the WaterTRAC database in conjunction with the WaterTRAC event processing software. So, the location naming logic is not readily identifiable via the enhanced water tracking data actually provided to clients. The naming logic allowed H2O Resources to identify the location name, the purpose (*i.e.*, pick-up, drop-off, or disposal) of a particular geo-location, and whether the data point is associated with a pipeline, truck, storage tank, well, etc. This location naming logic had been created and subsequently maintained by H2O Resources as its own proprietary, confidential information.

97.    H2O Resources protected all of its proprietary, confidential information with reasonable measures to maintain its confidentiality, including but not limited to the H2O Resources' Legal and Privacy Statement, which all users of the WaterTRAC database had to

agree to before being granted entry to the WaterTRAC database. H2O Resources also issued and required the use of unique username and passwords for each user of the WaterTRAC database. H2O Resources also restricted clients' access to only the forward-facing WaterTRAC database and prohibited client access to the WaterTRAC event processing software which assigns the location naming logic and created the enhanced water tracking data. Additionally, upon termination of any relationship with H2O Resources, or discontinuation of employment of any client user, H2O Resources immediately terminated that user's access to the WaterTRAC database.

98.    H2O Resources had agreements with all of its contractors that required them to keep confidential the proprietary confidential information of H2O Resources. If an H2O Resources' employee was terminated, H2O Resources would immediately terminate that former employee's access and, as part of the termination process, would send that former employee a letter detailing their obligations to keep all information learned during the course of their employment confidential.

99.    In May 2014, Mary Gilstrap attended an in-person meeting in Pennsylvania with Tommy Wilkerson and Drew Gladulich, during which Drew Gladulich mentioned that "the shortcomings of the WaterTRAC platform" would not be an issue anymore because the "new water tracking system would address it." Based on the timing of this meeting being close in time to the prior incident involving the QA document, Mary Gilstrap understood Drew Gladulich's reference to "shortcoming" to mean the inability of the WaterTRAC platform to correctly track the direction of waterflow without client communication when a previously unassigned location was involved.

100.    At the end of that May 2014 meeting, as Tommy Wilkerson walked Mary Gilstrap out to her car, Tommy Wilkerson told Mary Gilstrap that Drew Gladulich had gone to Carrizo management and gotten approval to use another water tracking system. As a result, Tommy Wilkerson then told Mary Gilstrap that Carrizo would no longer need the WaterTRAC platform to monitor fresh or produced water moved by truck, but Carrizo would still need to use the WaterTRAC platform to track pipeline water.

101.    H2O Resources had no reason to doubt Carrizo's representation that they were going with a new water tracking system because around May 2014, Jerry Murphy, a H2O Resources employee who serviced the H2O Resources equipment in Pennsylvania, also reported to Mary Gilstrap that Carrizo had begun to use a bar-code-based water tracking system on its trucks in Pennsylvania. There was no indication, at that time, that the bar-code system was implemented into any other aspect of Carrizo's business.

102.    By June 2014, as will be shown after a reasonable opportunity for discovery, that Jerry Murphy was hired away from H2O Resources and began to service and generally manage the bar-code-based water tracking system for trucks carrying Carrizo's water.

103.    While H2O Resources was concerned with this loss of Carrizo's truck-based water tracking business in Pennsylvania, H2O Resources' main business focus was on its pipeline-based water tracking product, which it continued to provide to Carrizo's pipeline operations in Ohio, Pennsylvania, and Texas.

104.    Accordingly, by the summer of 2014, although H2O Resources had lost Carrizo's truck-based water tracking business, it had no idea that Carrizo, or any of the other Defendants were defrauding and/or misappropriating information and data associated with pipeline-based water tracking from H2O Resources. In hindsight, it is now clear that Drew Gladulich's requests

for additional training and frequent demands (alone and in conjunction with Tommy Wilkerson) that H2O Resources defend its data accuracy and data collection techniques were really just part of All Defendants' scheme to misappropriate H2O Resources' trade secrets, proprietary and confidential information to develop a new oilfield water tracking platform to compete with and ultimately drive H2O Resources out of business.

### Tracking Carrizo's Pipeline-Based Water Operations

105.    In the summer of 2014, Tommy Wilkerson asked H2O Resources to consider hiring his son, Michael Wilkerson. By September 2014, Michael Wilkerson had been hired to work for H2O Resources in association with the services it was providing to Carrizo's South Texas operations. Michael Wilkerson received training and took day-to-day direction from Herb Pavelka.

106.    Herb Pavelka and Michael Wilkerson also performed separate electrical work for Carrizo relating to the installation of a salt water disposal line with the initial blessing of H2O Resources. However, after Tommy Wilkerson repeatedly redirected Herb Pavelka's priorities from his work for H2O Resource to his moonlighting duties for Carrizo, H2O Resources began growing weary of this arrangement.

107.    On or about October 2015, Herb Pavelka mentioned to Mary Gilstrap that Carrizo had begun installing secondary WaterTRAC flow meters within the same produced water pipelines that already had WaterTRAC flow meters installed, but at different locations within the pipeline. Specifically, one flow meter would be placed on one end of the pipeline, and the other flow meter on the other end of the pipeline. The WaterTRAC flow meters which were installed were purchased from H2O Resources; however, Carrizo maintained those meters.

108.    Following up with Carrizo on the information provided by Herb Pavelka regarding the installation of additional pipeline flow meters, Mary Gilstrap was advised by Carrizo that they were installing the duplicate flow meters to monitor for leaks in those pipelines. Carrizo reasoned that the flow meter measurement at one end of the pipeline would match the flow meter measurement at the other end of the pipeline.

109.    Charles Keith, President of H2O Resources, subsequently reached out to Tommy Wilkerson to advise him that Carrizo's redundant flow meters were unnecessary to monitor for leaks because H2O Resources' equipment and data could already provide information about pipeline leaks. If anything, Charles Keith advised Tommy Wilkerson that Carrizo should install pressure gauges if it was concerned about potential pipeline leaks. Despite H2O Resources' advice, Carrizo continued to install the secondary flow meters.

110.    H2O Resources' data collection units collected the meter data for both the first and secondary WaterTRAC flow meters, which was then available in the H2O WaterTRAC database for review by Carrizo.

111.    Shortly after the duplicate meter data was collected, Carrizo started to complain that the measurements collected at the meter at one end of the pipeline did not match the measurements collected at the meter on the opposite end of the pipeline. In response, Carrizo demanded an explanation for the deviations. Charles Keith explained that deviations in the measurements were to be expected, especially if the water had high levels of salts and/or acid because that would cause the meter to corrode, and would lead to improper meter data. Additionally, Charles Keith explained that if the meters were not being serviced properly it was possible that the meters were not reading correctly.

112.    After Carrizo would identify a deviation, Tommy Wilkerson would request that Herb Pavelka correct the meters, which would take Herb Pavelka away from his day-to-day H2O Resources' duties.

113.    In late October 2015, Herb Pavelka started receiving, via email, documents referred to as "GO" reports. However, Herb Pavelka could not understand the information contained in the "GO" reports. So, on October 30, 2015, Herb Pavelka forwarded a "GO" report to Mary Gilstrap to seek her advice on how to understand the information in the report. The "GO" reports, which were sent via email by reports@oilfieldtrackingservices.com, appeared to compare data from the WaterTRAC database of pipeline readings taken by the first flow meter with readings taken by the secondary flow meters for the same alleged time periods.

114.    The email Herb Pavelka forwarded to Mary Gilstrap with the "GO" Report had also been emailed to Tommy Wilkerson, Drew Gladulich, Jeremy Manno, as well as to H2O Resources' employee Michael Wilkerson by reports@oilfieldtrackingservices.com.

115.    After learning of the existence of the "GO" reports, H2O Resources investigated their source. Specifically, Mark Hamby, an employee of H2O Resources, searched for information regarding "Oilfield Tracking Services" on the internet. Then, Brian Bagby, another H2O Resources employee, called OTS to ask general questions about their business and the services they offered. During that conversation, an OTS representative told Brian Bagby that OTS was currently monitoring Carrizo's pipeline operations in South Texas. This disclosure suggested to H2O Resources that OTS may be separately monitoring another location of Carrizo pipeline in South Texas, because at least the "GO" reports appeared to reflect only H2O Resources' data. However, H2O Resources did not know where, or how OTS would have been

monitoring another location, because there was no indication OTS had a pipeline monitoring solution.

116.    Within an hour after Brian Bagby completed his call with OTS, either Tommy Wilkerson or Drew Gladulich from Carrizo called Brian Bagby and told him to not call OTS, again.

117.    H2O Resources' research of OTS in late 2015 led it to discover that the owner of OTS was Thomas Gladulich, Drew Gladulich's father. H2O Resources also discovered by reviewing OTS's website that OTS used a bar-code-based tracking system, which led H2O Resources to realize that OTS was also likely the company that Carrizo was now using to track truck water movements, including the water truck tracking business H2O Resources had lost from Carrizo in Pennsylvania.

118.    After learning of the "GO" Reports, H2O Resources developed and sent a corresponding report to everybody at Carrizo who had received the "GO" Report email shared with Mary Gilstrap, to prove that H2O Resources could create similar reports, and show that the data collected and stored by H2O Resources was not erroneous. In particular, H2O Resources' report streamlined and corrected the information in OTS' "GO" reports by identifying that OTS had pulled the meter readings at different times than the H2O Resources' meter readings used in their "GO" reports, which caused differences in the data between the two companies.

119.    Thus, part of All Defendants' scheme was to create a false comparison between the H2O Resources WaterTRAC enhanced water tracking data which was recorded at two different locations to give the appearance that H2O Resources WaterTRAC product did not correctly track water. All Defendants' prepared this "GO" report to falsely represent the H2O Resources' enhanced water tracking data in order to disparage H2O Resources' WaterTRAC

platform and associated services in the industry, as will likely be shown after a reasonable opportunity for discovery.

**The Conclusion of the Scheme**

120.    On March 31, 2016, Jeremy Manno, spoke as an employee and representative of Carrizo as part of a panel discussion at the 6th Annual Marcellus & Utica Water Management 2016 Conference in Pittsburgh, Pennsylvania, which is attended by people across the entire oil and gas industry. During his presentation, Jeremy Manno stated that Carrizo had put money into another fresh and produced water tracking system and wanted that system to become the industry standard for fresh and produced water tracking. Jeremy Manno even went so far as to offer during his presentation to distribute Drew Gladulich's business cards afterward, so that "Drew Gladulich could explain in detail to anyone interested how the new system worked."

121.    In June 2016, Carrizo explained to H2O Resources, through a telephone call made by Tommy Wilkerson to Charles Keith, that Carrizo was developing an in-house water tracking supervisory control and data acquisition ("SCADA") system to track water in pipelines and, thus, would no longer need H2O Resources' services. Tommy Wilkerson made a point of telling Charles Keith during that phone call that H2O Resources was not being replaced by a third party. And so, in reliance on Tommy Wilkerson's representation, H2O Resources agreed to sell Carrizo certain of its support equipment, including electrical panel boxes, solar panels, batteries, breakers, flow meter trailers, four-inch flow meters and antennas.

122.    In or about June 2016, Herb Pavelka and Michael Wilkerson, with H2O Resources' approval, were tasked with removing H2O Resources' data collection units while Carrizo was installing its own monitoring equipment. The purpose of this arrangement was to minimize the down time associated with the removal of the H2O Resources equipment and

installation of Carrizo's new equipment. Herb Pavelka subsequently told Mary Gilstrap by telephone that he was provided an iPad by Carrizo so he could take a picture of the "bar-code" on each newly-installed panel and subsequently email the pictures to Drew Gladulich at OTS. In view of Herb Pavelka's statement, H2O Resources' now believes that Michael Wilkerson removed the H2O Resources equipment, and Herb Pavelka followed behind him and installed the new electrical panels for the Carrizo "in-house" SCADA system.

123.    Also in June 2016, days after H2O Resources' termination by Carrizo and after the removal of its WaterTRAC equipment, Herb Pavelka was hired by Carrizo to work on its South Texas operations. However, H2O Resources was unaware that Carrizo had hired Herb Pavelka. So Herb Pavelka continued to work for and receive employment compensation from H2O Resources until his dual role was discovered by H2O Resources near the end of June, 2016 when a South Texas supply company told H2O Resources that Herb Pavelka was seen driving a Carrizo-owned truck.

124.    Finally, it was the concentrated combination of (1) Jeremy Manno's March 2016 statements at the water conference about Carrizo's new "industry standard," (2) Carrizo's June 2016 termination of H2O Resources, (3) Carrizo's June 2016 installation of a new bar-code-based pipeline water tracking system in South Texas, and (4) Carrizo's June 2016 surreptitious hiring of Herb Pavelka, that finally tipped H2O Resources off that they were replaced by OTS and not by some alleged internal Carrizo water tracking system.

125.    This concentrated combination of events also led H2O Resources to consider the possibility that its entire relationship with Carrizo may have been part of a scheme to defraud H2O Resources of its trade secrets, and confidential and proprietary information to enable

Carrizo, through its partner OTS, to develop an oilfield water tracking system for sale to the entire oil and gas industry in competition with H2O Resources.

**H2O Resources' Discoveries Post-Carrizo Relationship**

126.    In view of its new realizations, H2O Resources conducted an audit of its Carrizo WaterTRAC database data. The results of its audit showed that Drew Gladulich had been dumping entire months' worth of not only Carrizo's raw data, but also H2O Resources' proprietary organization of that raw data, and H2O Resources' enhanced water tracking data from the WaterTRAC database, one month at a time, for several months prior to Carrizo's June 2016 termination of its relationship with H2O Resources.

127.    Thus, Drew Gladulich, on behalf of All Defendants' enterprise, misappropriated H2O Resources' intellectual property rights in and comprising the WaterTRAC database for the benefit of All Defendants' third-party commercial enterprise. Defendant OTS used the computer credentials Drew Gladulich received to misappropriate H2O Resources' intellectual property rights. Drew Gladulich only received these computer credentials after assenting to H2O Resources' Legal and Privacy Statement, in which Drew Gladulich affirmed that "all present and further right in and to trade secrets, . . . copyrights and other proprietary rights under the laws of any domestic or foreign governmental authority (the 'Intellectual Property Rights') shall at all time be and remain the sole and exclusive property of H2O Resource, LLC..." Furthermore, Drew Gladulich expressly accepted the requirement that he would "view copy and print documents from [the WaterTRAC] database only for [Carrizo's] own internal business purposes." Moreover, notwithstanding Drew Gladulich's agreement not to transmit or redistribute the WaterTRAC database or its content, as will likely be shown after a reasonable opportunity for discovery, Drew Gladulich transferred the database and materials contained

within the database to OTS in further violation of the H2O Resources' Legal and Privacy Statement.

128.    As will likely be shown after a reasonable opportunity for discovery, in executing the scheme set forth above, Drew Gladulich abused H2O Resources' confidence by failing to disclose that he was an owner of OTS (a want-to-be competitor of H2O Resources), with the aid of Carrizo and Tommy Wilkerson in order to fraudulently obtain access to H2O Resources' confidential and proprietary intellectual property, in order to misappropriate H2O Resources intellectual property to more quickly, and less expensively develop OTS oilfield water tracking system.

129.    H2O Resources has also recently learned that on and before October 24, 2013, Thomas Gladulich prepared and ultimately filed a provisional patent application entitled "A Fluid Moving Tracking System, Especially Suitable for Water Produced in Connection with Oil and Gas Well Operations." A true and correct copy of that provisional patent application, U.S. Patent Application No. 61/895,045 is attached hereto as Exhibit "B."

130.    One or more of All Defendants subsequently directed that a non-provisional patent application be filed on or about October 24, 2014, based on the provisional patent application they previously caused to be filed. A true and correct copy of the Published Patent Application, 2015/0115026 is attached hereto as Exhibit "C."

131.    Although the published version of the patent application does not disclose it, records within the United States Patent and Trademark Office's PAIR system only made publicly-available after April 30, 2015 disclose that both the provisional and non-provisional patent applications were associated with an internal attorney docket designation: "CARRIZO," confirming that the patent applications were filed in conjunction with Defendant Carrizo.

132.    The provisional and non-provisional patent application relied upon, referenced and even incorporated water tracking information collected from the same areas tracked by H2O Resources as early as August 1, 2013, including pickup and delivery location, water type, number of gallons of water collected and delivered.

133.    As will likely be shown after a reasonable opportunity for discovery, Drew Gladulich also used H2O Resources' confidential and proprietary information that he learned from Mary Gilstrap under an abuse of confidence, including the naming logic, to enable him to compare the data collected by OTS to the data collected by H2O Resources for the purpose of developing OTS oilfield water tracking system.

134.    OTS also used the misappropriated WaterTRAC data obtained under an abuse of confidence by Drew Gladulich to generate the OTS "GO reports" to further OTS' business interests and ultimately put H2O Resources out of business. Specifically, in addition to the previously identified report sent on October 30, 2015, H2O Resources was able to identify additional reports sent to Herb Pavelka on June 19, 2016, and on or about October 28, 2015, December 7, 2015, and June 25, 2016, each of which contained a comparison between H2O Resources data collected at different flow meters.

135.    One or more of All Defendants also hired away H2O Resources employees' Jerry Murphy and Herb Pavelka for the purpose of obtaining H2O Resources' confidential and proprietary information about H2O Resources' equipment and service to use that information to implement the OTS/Carrizo oilfield water tracking system.

## COUNT I

### VIOLATION OF THE RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT (RICO)

136.    H2O Resources, LLC adopts and incorporates paragraphs 1 to 135 above as though fully set forth herein.

137.    This count is brought by H2O Resources against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson to recover for damages caused to Plaintiff by the Defendants' fraudulent scheme to misappropriate and convert H2O Resources' confidential and proprietary information to develop a competing water tracking system, to drive H2O Resources out of the market, and provide Defendant Carrizo with a surreptitious toe-hold in the "third-party" water tracking business.

138.    H2O Resources is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

139.    Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

140.    Sometime soon after May 20 2013, the formation date of Defendant OTS, that company and its owners, Defendants Thomas Gladulich and Drew Gladulich, who was also employed by Defendant Carrizo, combined forces with Defendant Tommy Wilkerson, the head of water tracking operations for Carrizo, and Defendant Carrizo for the common purpose of developing and perfecting an oilfield water tracking system, for use by both OTS and Carrizo, and since May 2013 the Defendants, each independently and collectively, have acted as a continuing unit to meet that purpose, and have had an ongoing business for that same purpose from May 2013 to about June 2016, and, as will be shown after a reasonable opportunity for discovery, through to the present day.

141.     Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy
Wilkerson also combined, came together and affiliated with each other forming an ongoing
organization for the common purpose of effectuating the scheme to defraud H2O Resources and
misappropriate from H2O Resources its trade secrets, proprietary data and confidential
information for the purpose of developing a new oilfield water tracking company and a new
competing oilfield water tracking system to drive H2O Resources out of the market, and All
Defendants functioned as a continuing unit throughout, from at least in or before May 2013 to
about June 2016, and, as will be shown after a reasonable opportunity for discovery, through to
the present day.

142.     The organizational structure formed by the combination of Defendants OTS,
Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson for the purpose of
conducting their collective scheme is an enterprise within the meaning of 18 U.S.C. §§ 1961(4)
and 1962(c) engaged in, or the activities of which affect, interstate commerce within the meaning
of 18 U.S.C. § 1962(c).

143.     Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy
Wilkerson each participated in the operation and management of the enterprise, and their acts
were each associated with the enterprise referred to in paragraphs 142 above, with each
conducting or participating, directly or indirectly, in the conduct of the enterprise's affairs
through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) (B) and (5),
that is, multiple:

    a.     Acts of wire fraud in violation of 18 U.S.C. § 1343;

    b.     Acts of interstate transportation of stolen property in violation of 18 U.S.C.
       § 2314; and

c.      Acts in violation of the Defend Trade Secrets Act of 18 U.S.C. § 1836.

144.    In particular, the enterprise, and each Defendant as part of that enterprise, committed the predicate acts of wire fraud by voluntarily and intentionally participating in a scheme to defraud H2O Resources of its WaterTRAC enhanced water tracking data and trade secrets, and confidential and proprietary information, by communicating through interstate telephone and email communications with H2O Resources through an abuse of confidence and deceit to obtain that enhanced water tracking data, trade secrets, and confidential and proprietary information, through at least the following acts:

(a)      In September 2013, Tommy Wilkerson introduced Drew Gladulich to Mary Gilstrap, heavily emphasizing Drew Gladulich's employment with Carrizo but failing to mention in any way whatsoever Drew Gladulich's relationship with H2O Resources' then want-to-be competitor OTS, a company that was already involved in tracking trucked water for Carrizo in Pennsylvania (see Figs. 1 and 4 of the Provisional Patent Application (Exhibit "B" hereto) containing Carrizo water trucking invoices and data from August 2013 and September 2013, respectively). With full and complete knowledge that Drew Gladulich was involved with H2O Resources' competitor, Tommy Wilkerson specifically requested that H2O Resources give Drew Gladulich full access to the WaterTRAC database containing H2O Resources proprietary enhanced water tracking data. At that time, H2O Resources was not only unaware of the existence of OTS, it had no idea that OTS was also providing water tracking services to oil and gas companies nor was it aware that Drew Gladulich was employed by OTS. In hindsight, this initial September 2013 meeting wherein Tommy Wilkerson requested Drew Gladulich have access to the WaterTRAC database was one of the first steps in

defrauding H2O Resources of its WaterTRAC enhanced water tracking data and trade secrets, and confidential and proprietary information, which soon after became a scheme to defraud through interstate channels.

(b)    From late 2013 to 2015, in a series of telephone calls, Mary Gilstrap answered Drew Gladulich's detailed questions regarding various basic aspects of the WaterTRAC database and H2O Resources' proprietary and confidential logic behind its naming of water locations in the WaterTRAC database. Drew Gladulich specifically and fraudulently framed these detailed questions as being for the benefit of Carizzo's improved use of H2O Resources' services, when it now appears his real motivation for asking the questions was to obtain proprietary information regarding H2O Resources' system to aid in the expedited development of the OTS competing water tracking system. In hindsight, all of these telephone calls from Drew Gladulich (and whomever unbeknownst to H2O Resources may have been present on Drew's side of the telephone) to Mary Gilstrap with questions about the database and enhanced water tracking data were part of the scheme to defraud H2O Resources out of its proprietary information to enable OTS, Carrizo and Drew and Thomas  Gladulich to further develop the OTS oilfield water tracking system, and ultimately have sufficient information for the filing of a non-provisional patent application. As will be shown after a reasonable opportunity for discovery, the telephone calls made by Drew Gladulich to Mary Gilstrap (i) may have surreptitiously included Thomas Gladulich (and/or other Defendants and/or other people associated with OTS), and/or (ii) Drew Gladulich's protests that he was not technologically inclined may have been falsely made for the purpose of deceiving H2O Resources into providing too much information about its proprietary system.

(c)     In early 2014, Drew Gladulich began to feign problems with the enhanced water tracking data gathered and reported in the WaterTRAC database, and several times, sometimes in conjunction with Tommy Wilkerson, he would call Mary Gilstrap and demand that she explain the enhanced water tracking data, including by sometimes comparing it to data culled by an undisclosed third party hydraulic fracturing or water service (that Plaintiff now believes to be OTS). In response, based on her understanding that Drew Gladulich lacked any technical expertise, which understanding Tommy Wilkerson and Drew Gladulich had personally cultivated over other phone calls, Mary Gilstrap would respond by over-disclosing H2O Resources' trade secrets and confidential and proprietary information relating to various aspects of H2O Resources' handling, servicing, and installation of H2O Resources' equipment, and H2O Resources' database management. In hindsight, the identification of problems by Drew Gladulich and Tommy Wilkerson were part of the scheme to defraud H2O Resources of its information to enable OTS and Carrizo to further develop the OTS oilfield water tracking system.

(d)     Even after the truck water tracking business relationship between H2O Resources and Carrizo ended, the telephone calls for the purpose of defrauding H2O Resources did not end. Specifically, Tommy Wilkerson called Mary Gilstrap in the summer of 2014 and requested that H2O Resources interview and hire his son Michael Wilkerson as a personal favor. In hindsight, the hire was not a personal favor at all, but had at least three purposes in furtherance of the scheme: (1) to free up Herb Pavelka's time thereby allowing Tommy Wilkerson to plumb Herb Pavelka for confidential and proprietary information related to the WaterTRAC hardware so that Defendants would be prepared to handle the hardware once H2O Resources was fully terminated, (2) to

persuade Herb Pavelka to come to work for Defendant Carrizo and/or Defendant OTS once H2O Resources was fully terminated, and (3) to have an extra set of hands trained and ready to assist in installing the new hardware once OTS and Carrizo took over the pipeline water tracking services and thereby minimize any downtime during the transition.

(e)    In October 2015, after discovering that Carrizo was installing duplicate water flow meters, Charles Keith, President of H2O Resources, asked Tommy Wilkerson over the telephone to explain Carrizo's purpose for installing redundant flow meters on pipelines in South Texas that were already being monitored by H2O Resources, and Tommy Wilkerson stated the purpose was to provide information about leaks. It is now known that the duplicate meters were installed as part of Defendants' collective enterprise and scheme to defraud H2O Resources of its WaterTRAC enhanced water tracking data and trade secrets, and confidential and proprietary information, and in turn, enable OTS to learn and understand H2O Resources' confidential enhanced water tracking data to further develop the OTS/Carrizo system.

(f)    In or around June 2015 and continuing through June 2016, one or more of the Carrizo Defendants accessed the WaterTRAC database, downloaded enhanced water tracking data and sent it to OTS electronically, either using a computer or some storage device, which OTS then, through at least Thomas Gladulich and Drew Gladulich, used to access the misappropriated enhanced water tracking data and prepare reports that falsely compared H2O Resources data collected at different flow meters. On several occasions, and at least on October 30, 2015 and June 19, 2016, and on or around October 28, 2015, December 7, 2015, and June 26, 2016, OTS sent reports via email containing the

misappropriated confidential and proprietary WaterTRAC enhanced water tracking data to individuals employed by Carrizo, including Drew Gladulich and Tommy Wilkerson. It is now known, that this was one more step in defrauding H2O Resources of its WaterTRAC enhanced water tracking data and trade secrets, and confidential and proprietary information.

(g)    During a telephone call in June 2015, Tommy Wilkerson told Charles Keith that Carrizo was developing its own in-house water tracking system, so it would no longer need H2O Resources' services, and requested the assistance of Michael Wilkerson and Herb Pavelka to remove the H2O Resources data collection unit while Carrizo installed "its own" new hardware to minimize down time. Based on Defendant Tommy Wilkerson's false statements, Charles Keith agreed to lend Michael Wilkerson and Herb Pavelka to Defendant Carrizo. In hindsight, H2O Resources now understands this was one more step in defrauding H2O Resources of its WaterTRAC enhanced water tracking data and trade secrets, and confidential and proprietary information.

145.    In particular, the enterprise, and at least Defendants Carrizo and Drew Gladulich as part of that enterprise, also committed the predicate act of interstate transportation of stolen property by knowingly, impermissibly and fraudulently, and in direct violation of H2O Resources' Legal and Privacy Statement, downloading WaterTRAC enhanced water tracking data on multiple occasions from the WaterTRAC database and which data had a value of more than $5000, and wherein the data was downloaded from the WaterTRAC database based in Oklahoma City, Oklahoma onto a computer, or other storage data device, in Pennsylvania, Delaware, Ohio and/or Texas, and that stolen data was transmitted and/or brought to Delaware

and/or Pennsylvania on a computer or other storage data device to be utilized by OTS, Thomas Gladulich, and Drew Gladulich in violation of 18 U.S.C. § 2314.

146.    In particular, the enterprise, and the All Defendants as part of that enterprise, also committed the predicate act of violating the Defend Trade Secrets Act, 18 U.S.C. § 1836, by misappropriating H2O Resources' trade secrets. Specifically, Defendants misappropriated H2O Resources' reasonably protected trade secrets relating to the location naming logic introduced by its WaterTRAC event processing system, other secrets related to its WaterTRAC event processing system, and H2O Resources' policies relating to the placement of flow meter policies, as described below:

(a)    Each trade secret is related to the WaterTRAC platform which is a product and service used in, or intended for use in, interstate commerce. Specifically, H2O Resources' clients could utilize the WaterTRAC database to pull reports and bills of lading to submit to its service providers and regulatory reporting agencies throughout the United States.

(b)    Each trade secret was protected by reasonable measures, such as (1) the Legal and Privacy Statement which required acceptance of confidentiality terms, among other things, to gain entry into the WaterTRAC database, (2) unique username and password protection of the WaterTRAC database, (3) granting access to only the forward-facing WaterTRAC database and no access to the WaterTRAC event processing software which operated the location naming logic, (4) user termination policies, and (5) employment termination policies, which included reminders to keep information confidential.

(c)    Each trade secret had an actual independent economic value from not being known, and not readily ascertainable through proper means by, any other person who can obtain economic value from the disclosure or use of the information. For instance, with respect to the location naming logic that underlies H2O Resources' organization of the raw data in the WaterTRAC database, it is applied only through the protected WaterTRAC event processing software, so the location naming logic is not readily identifiable in the enhanced water tracking data provided to clients or in the enhanced water tracking data provided to the Carrizo Defendants. In regards to the proprietary positioning of H2O Resources' flow meters on pipelines, while one could see the meters on the pipeline, they would not understand or be able to understand H2O Resources' logic in placing the meters at any particular location throughout the pipeline. Each of these trade secrets had an independent economic value, and each contributed to the overall economic value of the WaterTRAC platform and success of H2O Resources.

(d)    Defendants Drew Gladulich, Thomas Gladulich, and OTS impermissibly, and without consent, used the trade secret information relating to the location naming logic of H2O Resources to create reports which falsely compared H2O Resources' enhanced data from different meters on several occasions, including at least on October 30, 2015 and June 19, 2016, and on or around October 28, 2015, December 7, 2015, and June 26, 2016. As will be shown after a reasonable opportunity for discovery, OTS and Carrizo continue to use H2O Resources' naming logic today.

(e)    Defendants Drew Gladulich, Thomas Gladulich, and OTS derived the trade secret information relating to the location naming logic from Carrizo, Tommy Wilkerson, and Drew Gladulich, who acquired the trade secret information through a

series of misrepresentations and material omissions about Drew Gladulich's role within Carrizo, Drew Gladulich's hidden relationship with OTS, and Drew Gladulich's knowledge of database systems. Specifically, Drew Gladulich using all the misrepresentations previously identified, feigned his ignorance in understanding the WaterTRAC system and convinced Mary Gilstrap to disclose trade secret information to assist in his understanding of the WaterTRAC enhanced data. Additionally, Mary Gilstrap disclosed the trade secret information only in view of the business relationship between Carrizo and H2O Resources and Mary Gilstrap and H2O Resources had a reasonable belief that Drew Gladulich and Carrizo would maintain the secrecy of H2O Resources' disclosed trade secrets as part of that business relationship, and that Drew Gladulich and Carrizo knowing the information was a trade secret had a duty to maintain the secrecy of H2O Resources disclosed trade secret.

(f)     Defendant Carrizo impermissibly, and without consent, used the trade secret information relating to H2O Resources' policies on the placement of flow meter policies to install and service their own equipment after the H2O Resources relationship ended in June 2016.

(g)     Defendant Carrizo derived the trade secret information relating to H2O Resources' placement of flow meter policies from Drew Gladulich, who acquired the trade secret information through a series of misrepresentations and material omissions about Drew Gladulich's role within Carrizo, the existence of and his relationship with OTS, and his knowledge about database systems, and used that wrongfully acquired information for the benefit of the enterprise and to the detriment of H2O Resources. Specifically, Drew Gladulich, using all the misrepresentations previously identified,

challenged the enhanced data of the WaterTRAC system, which pressured Mary Gilstrap into disclosing trade secret information to prove to Carrizo that the WaterTRAC platform was accurate and produced reliable data. Mary Gilstrap also disclosed the trade secret information only in view of the confidential business relationship between Carrizo and H2O Resources, which gave H2O Resources a reasonable belief that Drew Gladulich and Carrizo would maintain the secrecy of its disclosed trade secrets as part of that business relationship, and that Drew Gladulich and Carrizo knowing the information was a trade secret had a duty to maintain that secrecy for the benefit of H2O Resources.

(h)     Additionally, Carrizo derived the trade secret information relating to H2O Resources' placement of flow meter policies via Tommy Wilkerson, who acquired the trade secret information through an abuse of confidence directed at H2O Resources' employee Herb Pavelka in or around June 2016. Specifically, Tommy Wilkerson requested that Herb Pavelka conduct additional work for Carrizo and used that opportunity to develop a relationship of trust with Herb Pavelka. The enterprise's goal for this relationship, as will likely be shown after a reasonable opportunity for discovery, was for Herb Pavelka to unknowingly provide confidential and proprietary information about H2O Resources' hardware and H2O Resources' flow meter policies to Tommy Wilkerson for the benefit of the enterprise. As will likely be shown after a reasonable opportunity for discovery, Tommy Wilkerson impermissibly gathered information provided to him by Herb Pavelka about the WaterTRAC platform equipment to enable Carrizo to understand the hardware it would need to later enable OTS and Carrizo to develop and implement a pipeline water tracking system.

147.    Carrizo benefited from, and was a central figure in all of the events identified above, and thus, was an active participant in the alleged scheme.

148.    OTS also benefited from, and was a central figure in all of the events identified above, and thus, was an active participant in the alleged scheme.

149.    Tommy Wilkerson's acts relating to the scheme were related to and committed within the course of his employment with Carrizo, each act Tommy Wilkerson committed was in furtherance of Carrizo's business, and Tommy Wilkerson's acts were authorized, or acquiesced to by Carrizo.

150.    Drew Gladulich's acts relating to the scheme were related to and committed within the course of his employment with Carrizo, each act Drew Gladulich committed was in furtherance of Carrizo's business, and Drew Gladulich's acts were authorized, or acquiesced in by Carrizo. Also, Drew Gladulich's acts relating to the scheme were related to and committed within the course of his role as Vice President of OTS, each act Drew Gladulich committed was in furtherance of OTS' business, and Drew Gladulich's acts were authorized, or acquiesced by OTS.

151.    Thomas Gladulich's acts relating to the scheme were related to and committed within the course of his role as Chief Executive Officer of OTS, each act Thomas Gladulich committed was in furtherance of OTS' business, and Thomas Gladulich's acts were authorized, or acquiesced by OTS.

152.    H2O Resources has been directly and distinctly injured by Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson in its business and property, within the meaning of 18 U.S.C. § 1964(c), in an amount as yet undetermined, by reason of a violation of 18 U.S.C. § 1962(c) collectively committed by said Defendants.

## COUNT II

## CONSPIRACY TO VIOLATE RICO

153.    H2O Resources, LLC adopts and incorporates paragraphs 1 to 152 above as though fully set forth herein.

154.    This count is brought by H2O Resources against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

155.    Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct or participate, directly or indirectly, in the conduct of the enterprise referred to in paragraph 142 above through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B) and (5), in violation of 18 U.S.C. § 1962(d), that is, multiple

    a.    Acts of wire fraud in violation of 18 U.S.C. § 1343;

    b.    Acts of interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and

    c.    Acts in violation of the Defend Trade Secrets Act of 18 U.S.C. § 1836.

156.    H2O Resources has been directly and distinctly injured by Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson in its business and property by reason of the Defendants acts set forth in paragraph 144-146 and 155, which were committed in furtherance of conspiracy, within the meaning of 18 U.S.C. § 1964(c), in an amount as yet undetermined, by reason of a violation of 18 U.S.C. § 1962(d) committed by said Defendants.

## COUNT III

## DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

157.    H2O Resources adopts and incorporates paragraphs 1 to 156 above as though fully set forth herein.

158.    This claim is brought by H2O Resources against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

159.    H2O Resources alleges that All Defendants misappropriated H2O Resources' reasonably protected trade secrets relating to the location naming logic introduced by its WaterTRAC event processing system, other secrets related to its WaterTRAC event processing system, and H2O Resources' policies on the placement of water pipeline flow meters.

160.    Each trade secret was protected by reasonable measures, and each trade secret had an actual independent economic value from not being known, and not readily ascertainable through proper means by, any other person who could obtain economic value from the disclosure or use of the information.

161.    Each Defendant knew or had reasons to know that it was using or disclosing the trade secrets without H2O Resources' express or implied consent at the time of use or disclosure.

162.    Each Defendant knew or had reason to know that the H2O Resources' trade secrets were derived from or through a person who had used improper means to acquire the trade secret, including acquiring those trade secrets through a series of misrepresentations directed at H2O Resources.

163.    Each Defendant also knew or had reason to know that the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; the trade secret was derived from or through a person who owed

a duty to H2O Resources to maintain the secrecy of the trade secret or limit the use of the trade secret; and/or before a material change of the position of the person, knew or had reason to know that-the trade secret was a trade secret; and knowledge of the trade secret had been acquired by accident or mistake.

164.    All Defendants' misappropriation was willful and malicious.

165.    All Defendants' misappropriation of this information has directly and proximately caused an injury to H2O Resources and has resulted in actual and consequential damages.

166.    H2O Resources has no adequate remedy at law for the wrongful actions of Defendants.

167.    As a result of All Defendants' misappropriation of trade secrets, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

### COUNT IV

### VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT, 12 P.S. § 5301, *et seq.*

168.    H2O Resources adopts and incorporates paragraphs 1 to 167 above as though fully set forth herein.

169.    This claim is brought by H2O Resources against All Defendants, *viz.* Defendant OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

170.    The acts conducted in furtherance of this tort claim primarily occurred in the Commonwealth of Pennsylvania.

171.    H2O Resources alleges that All Defendants misappropriated H2O Resources' reasonably protected trade secrets relating to the location naming logic introduced by its WaterTRAC event processing system, other secrets related to its WaterTRAC event processing system, and H2O Resources' policies on the placement of water pipeline flow meters.

172.    Each trade secret was protected by reasonable measures and kept from disclosure through all appropriate and necessary means, and each trade secret had an actual independent economic value from not being known, and not readily ascertainable through proper means by, any other person who could obtain economic value from the disclosure or use of the information.

173.    H2O Resources' trade secrets were critical to H2O Resources' success, and the Defendants' revealing of those trade secrets was detrimental to H2O Resources while providing Defendants a competitive advantage.

174.    Each Defendant knew or had reasons to know that the information obtained from H2O Resources were trade secrets, and that it was using or disclosing the trade secrets without H2O Resources' express or implied consent at the time of use or disclosure.

175.    Each Defendant knew or had reason to know that the H2O Resources' trade secrets were derived from or through a person who had used improper means to acquire the trade secret, including acquiring those trade secrets through a series of misrepresentations directed at H2O Resources.

176.    Each Defendant also knew or had reason to know that the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; the trade secret was derived from or through a person who owed a duty to H2O Resources to maintain the secrecy of the trade secret or limit the use of the trade secret; and/or before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret; and knowledge of the trade secret had been acquired by accident or mistake.

177.    All Defendants' misappropriation was willful and malicious.

178.    All Defendants' misappropriation of this information has directly and proximately caused an injury to H2O Resources, including significant financial losses, loss of their trade secrets, loss of goodwill, loss of business opportunities, and has resulted in actual and consequential damages.

179.    H2O Resources has no adequate remedy at law for the wrongful actions of Defendants.

180.    As a result of All Defendants' misappropriation of trade secrets, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## COUNT V

## OKLAHOMA FRAUD AND DECEIT

181.    H2O Resources adopts and incorporates paragraphs 1 to 180 above as though fully set forth herein.

182.    This claim is brought by H2O Resources against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

183.    The injury resulting from this tort claim primarily occurred in the State of Oklahoma.

184.    All Defendants made the following material misstatements of fact: (a) there were errors and discrepancies in the H2O Resources enhanced water tracking data that needed explanation, (b) Drew Gladulich had no understanding of water tracking software, (c) Carrizo was installing secondary water meters to "check for leaks"; (d) Carrizo was developing an in-house system water tracking replacement for the H2O Resources system, and (e) that Carrizo was "borrowing" Mr. Pavelka to help with the in-house Carrizo system.

185.   All Defendants concealed or failed to disclose the following material facts, despite their duty to do so: (a) the relationship between Drew Gladulich and Thomas Gladulich and/or OTS; (b) Carrizo's involvement in the development of the competing OTS oilfield water tracking system; (c) Carrizo's relationship with OTS, Thomas Gladulich and/or Drew Gladulich; and (d) Drew Gladulich's involvement with OTS, a want-to-be competitor of H2O Resources.

186.   All Defendants made the material misrepresentations of fact in paragraph 184 above knowing that they were false or made as positive assertions recklessly, without any knowledge of their truth. All Defendants made those misrepresentations with the intention that they be acted upon by H2O Resources, and H2O Resources in fact acted in reliance upon those misrepresentations to its detriment and suffered significant injury as a result of that reliance. Specifically, without knowledge of the Defendants' misrepresentations, H2O Resources (1) provided Drew Gladulich with access to and information about its WaterTRAC database and platform and enhanced water tracking data, (2) provided Carrizo with knowledge about its water meters through Mr. Pavelka, (3) provided Mr. Pavelka's services to install the "in-house" meters, and (4) sold Carrizo equipment that was later used with the OTS oilfield water tracking system.

187.   All Defendants concealed or failed to disclose the material facts set forth in paragraph 185 above, despite their duty to do so. All Defendants concealed or failed to disclose the material facts set forth in paragraph 185 with the intent of creating false impressions of the actual facts in the mind of H2O Resources, and with the intention that H2O Resources act upon those false impressions. H2O Resources in fact acted in reliance upon those false impressions and suffered injury as a result of that reliance. Specifically, without knowledge of the material facts, H2O Resources provided Drew Gladulich and Carrizo with access to and information about its WaterTRAC platform and enhanced water tracking data.

188.    All Defendants have acted intentionally and with actual malice and/or with reckless disregard for the rights of H2O Resources.

189.    All Defendants' unlawful fraudulent acts directly and proximately resulted in damage and injury to H2O Resources.

190.    H2O Resources has no adequate remedy at law for the wrongful actions of Defendants.

191.    As a result of All Defendants' fraud and deceit, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## COUNT VI

## PENNSYLVANIA FRAUD AND DECEIT

192.    H2O Resources adopts and incorporates paragraphs 1 to 191 above as though fully set forth herein.

193.    This claim is brought by H2O Resources against All Defendants, *viz.* Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

194.    The acts in furtherance of this tort claim primarily occurred in the Commonwealth of Pennsylvania.

195.    All Defendants made the following material misstatements of fact: (a) there were errors and discrepancies in the H2O Resources enhanced water tracking data that needed explanation and (b) Drew Gladulich had no understanding of water tracking software.  Each statement was material as it related to the amount and type of information that H2O Resources disclosed to Defendants.

196.    All Defendants made the material misrepresentations of fact in paragraph 195 above knowing that they were false or made as positive assertions recklessly, without any

knowledge of their truth. All Defendants made those misrepresentations with the intention that the misrepresentations would mislead H2O Resources to act upon them, and H2O Resources in fact acted in justifiable reliance upon those misrepresentations to its detriment and suffered significant injury as a result of that reliance. Specifically, without knowledge of the Defendants' misrepresentations, H2O Resources provided Drew Gladulich with access to and confidential information about its WaterTRAC database and platform and enhanced water tracking data.

197.    All Defendants have acted intentionally and with actual malice and/or with reckless disregard for the rights of H2O Resources.

198.    All Defendants' unlawful fraudulent acts directly and proximately resulted in damage and injury to H2O Resources.

199.    H2O Resources has no adequate remedy at law for the wrongful actions of Defendants.

200.    As a result of All Defendants' fraud and deceit, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## COUNT VII

## VIOLATION OF OKLAHOMA DECEPTIVE TRADE PRACTICES ACT

201.    H2O Resources adopts and incorporates paragraphs 1 to 200 above as though fully set forth herein.

202.    This claim is brought by H2O Resources against Defendant OTS.

203.    The injury resulting from this tort claim primarily occurred in the State of Oklahoma.

204.    The acts of Defendant OTS constitute deceptive trade practices under the Oklahoma Deceptive Trade Practices Act, 78 Okla. Stat. tit, § 51 *et. seq.*

205.    In particular, OTS is a competitor of H2O Resources and it has violated 78 Okla. Stat. tit, § 51 *et. seq.* because it:

(a)    made false representations about the validity and correctness of H2O Resources' enhanced water tracking data and the efficiency of its WaterTRAC platform, and H2O Resources has been damaged by OTS' false representations,

(b)    disparaged H2O Resources' WaterTRAC platform and H2O Resources' business by making false representations about the validity and correctness of H2O Resources' enhanced water tracking data and the efficiency of its WaterTRAC platform, and H2O Resources has been damaged by OTS' false representations and disparagement, and

(c)    misappropriated and used H2O Resources' trade secrets, and confidential and proprietary information and documents, and H2O Resources has been damaged by OTS' misappropriation.

206.    The actions of Defendant OTS, in knowingly, willfully and maliciously (1) making false representations about H2O Resources' enhanced water tracking data and WaterTRAC platform, (2) disparaging H2O Resources' enhanced water tracking data, WaterTRAC platform, and business, and (3) misappropriating and using H2O Resources' trade secrets, and confidential and proprietary information and documents, have directly and proximately caused injury and damages to H2O Resources.

207.    Defendant OTS has realized revenue and profits by virtue of its wrongful acts that it otherwise would not have obtained and to which it is not entitled. H2O Resources will likely have additional evidentiary support after a reasonable opportunity for further discovery on this issue.

208.    H2O Resources has no adequate remedy at law for the wrongful actions of Defendant OTS.

209.    As a result of the actions of Defendant OTS, H2O Resources has suffered damages in an amount to be proven at trial.

## COUNT VIII

## OKLAHOMA CIVIL CONSPIRACY

210.    H2O Resources adopts and incorporates paragraphs 1 to 209 above as though fully set forth herein.

211.    This claim is brought by H2O Resources against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

212.    The injury resulting from this tort claim primarily occurred in the State of Oklahoma.

213.    All Defendants acted together with a meeting of the minds to drive H2O Resources out of business and establish the Defendants' own oilfield water tracking company with a new oilfield water tracking system and in doing so sought to restrain trade in produced water tracking systems through fraud, theft of trade secrets, and product and business disparagement.

214.    Each Defendant had a role to play in the unfolding of this conspiracy. Drew Gladulich and Tommy Wilkerson unlawfully misappropriated trade secrets and confidential information and enhanced water tracking data from H2O Resources. Drew Gladulich was able to gain the confidence of H2O Resources and access to H2O Resources' trade secrets, proprietary and confidential information and enhanced water tracking data as an employee of Carrizo, while hiding his dual role as an employee of OTS, with the help of Defendants Carrizo and Tommy

Wilkerson. Drew Gladulich ultimately fed the ill-gotten information and enhanced water tracking data that he misappropriated from H2O Resources to his father, Thomas Gladulich, who was working as an officer and employee of Defendant OTS to develop a water tracking system and database to compete with and ultimately drive H2O Resources out of business using H2O Resources' own misappropriated trade secrets and confidential information and enhanced water tracking data. Tommy Wilkerson used the confidential information he obtained via Herb Pavelka about H2O Resources WaterTRAC hardware, and Carrizo used that information to prepare the hardware needed to implement the OTS oilfield water tracking system. OTS also used H2O Resources' stolen enhanced water tracking data in an effort to disparage H2O Resources by suggesting that H2O Resources' data collection units were the reason the data was incorrect.

215.    Thus, All Defendants used overt acts of fraud and deceit to induce H2O Resources to share its trade secrets and confidential and proprietary information with Carrizo, which led to the Defendants' overt act of theft of trade secrets and misappropriation of H2O Resources' confidential and proprietary information for use by OTS, which then led to OTS' overt act of trade disparagement when it intentionally compared H2O Resources' interim (rather than final) enhanced water tracking data.

216.    All Defendants' acts of civil conspiracy has directly and proximately resulted in damage and injury to H2O Resources, including at least the theft of H2O Resources' trade secrets, the harm to H2O Resources' business reputation, and ultimately the entire loss of H2O Resources' business.

217.    H2O Resources has no adequate remedy at law for the wrongful actions of Defendants.

218.    As a result of All Defendants' civil conspiracy, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

### COUNT IX

### PENNSYLVANIA CIVIL CONSPIRACY

219.    H2O Resources adopts and incorporates paragraphs 1 to 218 above as though fully set forth herein.

220.    This claim is brought by H2O Resources against All Defendants, *viz.* Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

221.    The acts that support this tort claim primarily occurred in the Commonwealth of Pennsylvania.

222.    All Defendants combined and acted together with a common purpose to drive H2O Resources out of business and establish All Defendants' oilfield water tracking company with a new oilfield water tracking system and in doing so sought to restrain trade in produced water tracking systems through theft of trade secrets and fraud.

223.    Each Defendant had a role to play in the unfolding of this conspiracy. Drew Gladulich and Tommy Wilkerson unlawfully misappropriated trade secrets and confidential information and enhanced water tracking data from H2O Resources. Drew Gladulich was able to gain the confidence of H2O Resources and access to H2O Resources' trade secrets, proprietary and confidential information and enhanced water tracking data as an employee of Carrizo, while hiding his dual role as an employee of OTS, with the help of Defendants' Carrizo and Tommy Wilkerson. Drew Gladulich ultimately fed the ill-gotten information and enhanced water tracking data that he misappropriated from H2O Resources to his father, Thomas Gladulich, who was working as an officer and employee of Defendant OTS to develop a water tracking system and

database to compete with and ultimately drive H2O Resources out of business using H2O Resources' own misappropriated trade secrets and confidential information and enhanced water tracking data.

224.    Thus, All Defendants used overt acts of fraud and deceit to induce H2O Resources to share its trade secrets and confidential and proprietary information with Carrizo, which led to the Defendants' overt act of theft of trade secrets and misappropriation of H2O Resources' confidential and proprietary information for use by OTS.

225.    All Defendants' acts of civil conspiracy has directly and proximately resulted in damage and injury to H2O Resources, including at least the theft of H2O Resources' trade secrets, confidential and proprietary information, the harm to H2O Resources' business reputation and goodwill, and ultimately the entire loss of H2O Resources' business.

226.    H2O Resources has no adequate remedy at law for the wrongful actions of Defendants.

227.    As a result of All Defendants' civil conspiracy, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## COUNT X

## OKLAHOMA UNFAIR COMPETITION

228.    H2O Resources adopts and incorporates paragraphs 1 to 227 above as though fully set forth herein.

229.    This claim is brought by H2O Resources against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

230.    The injury resulting from this tort claim primarily occurred in the State of Oklahoma.

231.    All Defendants have unfairly competed and are unfairly competing with H2O Resources by using H2O Resources' trade secrets, and confidential and proprietary information, which are not readily available to competitors, and which were gained through H2O Resources' prior business relationship with Carrizo. All Defendants used and are using H2O Resources' trade secrets, and confidential and proprietary information with an intent to unfairly compete with and cause injury to H2O Resources, and All Defendants' unlawful conversion has injured H2O Resources.

232.    All Defendants' acts of unfair competition have directly and proximately resulted in damage and injury to H2O Resources.

233.    All Defendants have realized revenue and profits by virtue of its wrongful acts that they otherwise would not have obtained and to which they are not entitled. H2O Resources will likely have additional evidentiary support after a reasonable opportunity for further discovery on this issue.

234.    H2O Resources has no adequate remedy at law for the wrongful acts of the All Defendants.

235.    As a result of All Defendants' unfair competition, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## COUNT XI

### PENNSYLVANIA UNFAIR COMPETITION

236.    H2O Resources adopts and incorporates paragraphs 1 to 235 above as though fully set forth herein.

237.    This claim is brought by H2O Resources against All Defendants, *viz.* Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

238.    The acts that support this tort claim primarily occurred in the Commonwealth of Pennsylvania.

239.    All Defendants have unfairly competed and are unfairly competing with H2O Resources by using H2O Resources' trade secrets, and confidential and proprietary information, which are not readily available to competitors, and which were gained through H2O Resources' prior business relationship with Carrizo. All Defendants used and are using H2O Resources' trade secrets, and confidential and proprietary information to intentionally, willfully, maliciously, and with reckless disregard unfairly compete with and cause injury to H2O Resources.

240.    All Defendants' acts of unfair competition, and other unfair and deceptive acts and practices violate H2O Resources' rights and have directly and proximately resulted in damage and injury to H2O Resources, including at least the theft of H2O Resources' trade secrets, confidential and proprietary information, the harm to H2O Resources' business reputation and goodwill, and ultimately the entire loss of H2O Resources' business.

241.    All Defendants have realized revenue and profits by virtue of its wrongful acts that they otherwise would not have obtained and to which they are not entitled. H2O Resources will likely have additional evidentiary support after a reasonable opportunity for further discovery on this issue.

242.    H2O Resources has no adequate remedy at law for the wrongful acts of the All Defendants.

243.    As a result of All Defendants' unfair competition, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## COUNT XII

## CONVERSION AND MISAPPROPRIATION OF BUSINESS AND <u>CONFIDENTIAL INFORMATION</u>

244.    H2O Resources adopts and incorporates paragraphs 1 to 243 above as though fully set forth herein.

245.    This claim is brought by H2O Resources against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

246.    The injury resulting from this tort claim primarily occurred in the State of Oklahoma.

247.    H2O Resources is the owner of confidential business information and intangible property, including years of enhanced water tracking data derived, compiled and maintained by H2O Resources from Carrizo raw data which was stored in H2O Resources' WaterTRAC database.

248.    All Defendants intentionally and without H2O Resources' authorization converted and misappropriated H2O Resources' confidential business information and intangible property, including:

(a)    the years of enhanced water tracking data (*i.e.* intangible property) derived, compiled and maintained by H2O Resources from Carrizo raw data which was stored in H2O Resources' WaterTRAC database,

(b)    business information relating to the naming logic utilized in the WaterTRAC platform for the enhanced water tracking data,

(c)    business information relating to the placement of water flow meters in water pipelines for accurate readings,

(d)    business information relating to an improved schedule for calibrating water flow meters in pipelines for accurate readings, and

(e)    business information relating to the hardware equipment required for the development of a water tracking system.

249.    Carrizo originally obtained the converted and misappropriated H2O Resources' confidential business information and intangible property through a relationship between H2O Resources and Carrizo; and as part of that relationship H2O Resources had a reasonable business expectation that Carrizo would maintain that information confidential, and had safeguards in place to protect the information as confidential. However, Carrizo, on its own, and through the other Defendants, intentionally converted and misappropriated H2O Resources' confidential information and intangible property through an abuse of confidence and impropriety, and then, as will be shown after a reasonable opportunity for discovery, impermissibly shared that confidential business information and intangible property with OTS, which enabled OTS and Carrizo to develop a competing oilfield tracking system.

250.    All Defendants misappropriation and conversion of H2O Resources' confidential business information and intangible property has directly and proximately resulted in damage and injury to H2O Resources.

251.    H2O Resources has no adequate remedy at law for the wrongful acts of the Defendants.

252.    As a result of All Defendants' misappropriation and conversion of H2O Resources' confidential business information and intangible property, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## COUNT XII

## <u>UNJUST ENRICHMENT</u>

253.    H2O Resources adopts and incorporates paragraphs 1 to 252 above as though fully set forth herein.

254.    This claim is brought by H2O Resources against All Defendants, *viz.* Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson.

255.    The acts that support this tort claim primarily occurred in the Commonwealth of Pennsylvania.

256.    All Defendants sought to be enriched and were enriched by their unlawful misappropriation of H2O Resources' trade secrets and other confidential and proprietary business information.

257.    All Defendants used (1) H2O Resources' trade secrets, including its location naming logic introduced by its WaterTRAC event processing system and H2O Resources' policies on the placement of flow meters, and (2) H2O Resources' other confidential and proprietary business information, including its WaterTRAC enhanced data, and in using those trade secrets, and confidential and proprietary business information, Defendants were unjustly enriched by enabling the Defendants to develop a competing oilfield tracking system, and in turn, obtaining business that it could not have obtained otherwise.

258.    All Defendants improperly used H2O Resources' trade secrets, and confidential and proprietary business information for their own enrichment and to the detriment and harm of H2O Resources.

259.    All Defendants are obligated to disgorge the benefits derived from their unlawful conduct, and to compensate H2O Resources in the amount of all wrongfully obtained business, profits, and benefits.

260.    It would be unequitable, unfair, and unconscionable for Defendants to be allowed to continue to benefit from their unlawful conduct without paying appropriate compensation to H2O Resources.

261.    All Defendants' conduct has directly and proximately resulted in damage and injury to H2O Resources, including at least the theft of H2O Resources' trade secrets, confidential and proprietary information, the harm to H2O Resources' business reputation and goodwill, and ultimately the entire loss of H2O Resources' business.

262.    H2O Resources has no adequate remedy at law for the wrongful acts of the Defendants.

263.    As a result of All Defendants' unjust enrichment, H2O Resources has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## REQUEST FOR RELIEF

Wherefore, H2O Resources requests that the court enter judgment on its behalf:

1.    Against Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson, jointly and severally, for the First and Second Claims of Relief for:

(a)    compensatory and actual damages for damage and injury to business or property in an amount as yet undetermined;

(b)    damages for injury to business or property trebled in accordance with 18 U.S.C. § 1964(c);

(c)    consequential damages;

(d)      pre- and post- judgment interest;

(e)      reasonable attorneys' fees and costs in accordance with 18 U.S.C. § 1964(c) and Oklahoma and Pennsylvania law; and

(f)      costs of investigation and suit in an amount to be determined, trebled in accordance with 18 U.S.C. 1964(c).

2.      Against All Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson, jointly and severally, for the Third and Fourth Claim of Relief for:

(a)      compensatory and actual damages caused by the misappropriation of the trade secret ;

(b)      consequential damages;

(c)      exemplary damages doubled in accordance with 18 U.S.C. § 1836(c) and 12 Pa.C.S. § 5304; and

(d)      attorneys' fees in accordance with 18 U.S.C. § 1836(d) and 12 Pa.C.S. § 5305.

3.      Against All Defendants OTS, Carrizo, Drew Gladulich, Thomas Gladulich, and Tommy Wilkerson and, jointly and severally, for the Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Claims of Relief; and Defendant OTS for the Seventh Claim of Relief for:

(a)      compensatory and actual damages for damage and injury to business or property in an amount as yet undetermined;

(b)      punitive damages;

(c)      consequential damages;

(d)      pre- and post-judgment interest; and

(e)    reasonable attorneys' fees and costs in accordance with Oklahoma Law.

4.    For any and all other relief, at law or equity, to which H2O Resources, LLC may show itself to be entitled.

5.    Any additional relief which the Court may deem appropriate.

## JURY DEMAND

H2O Resources, LLC hereby demands a jury trial under Federal Rules of Civil Procedure 38(b).

DATED:  March 16, 2018

Respectfully submitted,

By:

Barry L. Cohen
ROYER COOPER COHEN BRAUNFELD LLC
101 W. Elm Street, Suite 400
Conshohocken, PA 19428
E-mail: bcohen@rccblaw.com
Telephone:    484-362-2628
Facsimile:    484-362-2630

-AND-

Jordan A. Sigale, Illinois ARDC No. 6210047
(*pro hac vice* pending)
E-mail: jsigale@dunlapcodding.com
Julie Langdon, Illinois ARDC No. 6291722
(*pro hac vice* pending)
E-mail: jlangdon@dunlapcodding.com
**DUNLAP CODDING PC**
225 West Washington St., Ste. 2200
Chicago, IL 60606
Telephone:    (312) 651-6744
Facsimile:    (312) 546-6284

-AND-

Douglas J. Sorocco, Okla. Bar No. 17347; Illinois ARDC
No. 2381747 (*pro hac vice pending*)
E-mail: dsorocco@dunlapcodding.com
Evan W. Talley; Okla. Bar No. 22923
(*pro hac vice pending*)
E-mail: etalley@dunlapcodding.com
**DUNLAP CODDING PC**
609 West Sheridan Avenue
Oklahoma City, OK 73102
Telephone:      (405) 607-8600
Facsimile:      (405) 607-8686

**ATTORNEYS FOR PLAINTIFF**
**H2O RESOURCES, LLC**