# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| H2O RESOURCES, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 18-1164 |
| | : | |
| OILFIELD TRACKING SERVICES, LLC, | : | |
| | : | |
| CARRIZO OIL & GAS, INC., | : | |
| | : | |
| DREW GLADULICH, | : | |
| | : | |
| THOMAS GLADULICH, and | : | |
| | : | |
| THOMAS WILKERSON, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                        **JUNE 22, 2018**

      Government regulations of various states require that water produced during the removal of oil and gas from the ground be collected and disposed of into approved water disposals and be closely monitored to discourage dumping, contamination, and pollution. Due to these regulations, Plaintiff H2O Resources, LLC ("H2O") developed an oilfield water tracking system called "WaterTRAC" that assisted oil and gas companies in managing the large quantity of water produced and used during the oil and gas removal process.

      H2O filed suit in this Court against Defendants Oilfield Tracking Services, LLC ("OTS"), Carrizo Oil & Gas, Inc. ("Carrizo"), Drew Gladulich ("Gladulich"), Thomas Gladulich, and Thomas Wilkerson ("Wilkerson") (collectively, "Defendants"), alleging Defendants developed a scheme to defraud and misappropriate H2O's trade secrets, proprietary data, and

confidential information to create a new oilfield water tracking company and a new oilfield water tracking system to drive H2O out of the market. H2O and Carrizo entered into two "Master Service Agreements" ("MSA") during the course of their business relationship, the latter of which applies to this case and contains arbitration and forum selection clauses. Carrizo and Wilkerson now move to dismiss the Complaint and compel arbitration or, in the alternative, transfer the action to the United States District Court for the Southern District of Texas. OTS, Drew Gladulich,[1] and Thomas Gladulich similarly move to dismiss the Complaint and compel arbitration, but do not move for transfer. For the reasons noted below, Defendants' Motions are granted to the extent they seek arbitration of H2O's allegations, and we will therefore dismiss H2O's Complaint without prejudice.

## I.  BACKGROUND[2]

### A.  H2O's WaterTRAC Platform

Due to government regulations of various states that regulate water produced during the removal of oil and gas from the ground, H2O in 2008 began developing its preliminary WaterTRAC platform after receiving confirmation that states would accept electronically gathered water tracking data. (Compl. ¶ 41.) WaterTRAC is an oilfield tracking system that assists oil and gas companies manage the large volume of water produced during the oil and gas removal process from the ground. (*Id.* ¶ 43.) H2O's WaterTRAC platform consists of the WaterTRAC hardware,[3] the WaterTRAC database, which is a secure regional database that

---

[1] Unless otherwise noted, we will refer to Drew Gladulich as "Gladulich."

[2] As discussed below, the Court will analyze Defendants' Motions under the motion to dismiss for failure to state a claim standard. Accordingly, we take the facts alleged in the Complaint as true, as we must when deciding a motion under Federal Rule of Civil Procedure 12(b)(6). *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted).

[3] The WaterTRAC hardware includes data collection units, such as automated flow meters and associated GPS devices, radio transmitters, and antennas. (Compl. ¶ 45.)

collects, stores, and organizes raw water data, and the WaterTRAC software, which "further operate[s] on the raw data to create enhanced water tracking data[] [and] [is] also stored in the WaterTRAC database." (*Id.* ¶ 45.) The WaterTRAC platform is able to track fresh and produced water via a series of water meters, GPS trackers, and antennas to transmit the raw data, such as volume and location, to the database through the internet. (*Id.* ¶ 50.) The raw data is then organized through the proprietary WaterTRAC event processing software, in which the enhanced water tracking data is stored in the WaterTRAC database. (*Id.*) According to H2O, the raw data alone is sufficient for its clients to "pull reports, produce bills of lading, and produce state regulatory reports." (*Id.* ¶ 45.)

Some clients use tanker trucks to transport water. (*Id.* ¶ 51.) In that case, the WaterTRAC hardware tracks the water from pick-up to drop-off using the truck's volume and GPS locations. (*Id.*) The raw data is then transmitted to the database through the internet, "where [H2O's] proprietary WaterTRAC event processing software processe[s] and organize[s] that raw data and the WaterTRAC database store[s] that processed and enhanced water tracking data." (*Id.*) When clients use pipelines to transport their fresh and produced water, the WaterTRAC hardware track[s] the water through a series of water meters. (*Id.* ¶ 52.) As before, the raw data is processed and organized by the WaterTRAC event processing software and then stored in the WaterTRAC database. (*Id.*)

The typical scope of services provided by H2O relating to the sale of the WaterTRAC platform includes

> (1) the installation, maintenance, and service of the WaterTRAC hardware, (2) automated flow metering, (3) electronic field mapping and geo-fence design of water collection locations, (4) real-time raw data transmission to the WaterTRAC database, (5) database management, (6) formatting data for submission to governmental regulatory agencies, (7) consulting on the regulatory

requirements for the client's operational areas, (8) alerts relating to various tracking parameters, (9) retention of water tracking data, and (10) user-training and WaterTRAC database access for a limited number of authorized employees of H2O Resources' clients.

(*Id.* ¶ 49.)  H2O also provides trained field employees to install and maintain the WaterTRAC

hardware in connection with its sale of the WaterTRAC platform services.  (*Id.* ¶ 55.)

Every company that purchases H2O's services is provided with the ability to access the

WaterTRAC database.  (*Id.* ¶ 59.)  To facilitate that benefit, the company is permitted to identify

and authorize certain individuals to access their company's water tracking data in the database.

(*Id.*)  These employees periodically pull reports on the water tracking data for internal and

external reporting purposes.  (*Id.*)  In addition, H2O assists the authorized individuals in

understanding their company's data and answers questions about the enhanced water tracking

data and the WaterTRAC database.  (*Id.*)  Prior to gaining access to the database, each authorized

user is emailed and required to review and accept H2O's "Legal and Privacy Statement," which

states, in part:

You are entitled to view copy and print any documents from this database but only for your own internal business purposes.  You acquire absolutely no rights or licenses in or to the database or the materials contained within the database other than the limited right to use the database in accordance with this Legal and Privacy Statement.  Any sale, transmission or redistribution of this database or its content, and any copying, modification or other use of this database or its content for any purposes other than your own internal business purposes, are strictly prohibited.  **All present and future rights in and to trade secrets, trademarks, service marks, copyrights and other proprietary rights under the laws of any domestic or foreign governmental authority (the "Intellectual Property Rights") shall at all times be and remain the sole and exclusive property of H2O Resources LLC**.  Except as specifically permitted by the terms of this Legal and Privacy Statement, you shall not use the Intellectual Property Rights or the database, or any derivations thereof, for any purpose, without H2O Resources LLC's prior written approval.

4

(*Id.* ¶ 60, Ex. A ("Legal and Privacy Statement")) (emphasis in original).  Every user of the WaterTRAC database is also provided with a unique username and password that are necessary for accessing it.  (*Id.* ¶ 61.)  Before a user gains access to the database, he or she is required to review and accept the Legal and Privacy Statement that is prompted on the home login screen. (*Id.*)

### B.    H2O and Carrizo's Business Relationship

In late 2011, Wilkerson hired H2O to provide services on behalf of Carrizo.[4]  (*Id.* ¶ 62.) Specifically, Carrizo wanted H2O to monitor fresh water movements in its Pennsylvania pipeline and to assist in the creation of detailed regulatory reports in compliance with Pennsylvania law. (*Id.*)  Carrizo eventually expanded its relationship with H2O to include monitoring the movement of fresh and produced water by truck in Pennsylvania.  (*Id.* ¶ 63.)  By late 2012, H2O's services were being used for Carrizo's pipeline operations near San Antonio, Texas.  (*Id.*)  And by the end of 2013, H2O's services were used for Carrizo's pipeline operations in Ohio.  (*Id.*)

#### 1.    *The Master Service Agreements*

H2O and Carrizo entered into an MSA in late 2011 ("2011 MSA").  (*Id.* ¶ 64.)  In addition, H2O and "Carrizo (Eagle Ford) LLC," which is a wholly owned subsidiary of Carrizo that was formed to develop Carrizo's oil and gas resources in South Texas, executed an MSA in 2014 ("2014 MSA").  (*Id.* ¶ 65.)  Carrizo is included under the 2014 MSA because the agreement covered affiliates of Carrizo (Eagle Ford) LLC.  (*Id.*)  Further, the 2014 MSA superseded the 2011 MSA because it states that it "sets forth the full and complete arrangement of the parties . . .

---

[4] H2O pleads that Wilkerson, a resident of Houston, Texas, is a Carrizo employee who "was given the responsibility of supervising the management of all water used or produced in association with Carrizo's oil development and production efforts throughout the United States, including those in Pennsylvania, Ohio, and Texas."  (Compl. ¶ 12.) "Upon information and belief, [he] is currently employed as the Water, Drilling, and Water Transportation Manager of Carrizo."  (*Id.*)

and supersedes any and all . . . agreements and representations of the parties prior to the execution hereof." (Carrizo's Mem. Law Supp. Mot. Dismiss to Compel Arbitration or Transfer Venue, Ex. B ("2014 MSA") § 10.13.) The 2014 MSA contains an arbitration provision and a forum selection clause, providing as follows:

> 10.3. **Arbitration of Disputes**. If a dispute, claim or controversy arises out of, in connection with, or results from the performance of this agreement, or the breach thereof, and if such dispute, claim or controversy cannot be settled through direct discussions, the parties agree to first endeavor to settle the dispute in an amicable manner by mediation administered by the American Arbitration Association . . . before resorting to arbitration. Thereafter, any unresolved dispute, claim or controversy arising out of, in connection with, or resulting from the performance of this agreement, or the breach thereof, will be settled by a binding arbitration conducted pursuant to the Rules of the American Arbitration Association. Arbitration is to be conducted in Houston, Texas before a single arbitrator with expertise in the subject matter of this contract.
>
> \*     \*     \*
>
> 10.7. **Governing Law; Jurisdiction; Venue**. The terms and provisions of this agreement will be construed under and governed by the laws of the State of Texas without giving effect to the principles of conflicts of laws. Notwithstanding anything herein to the contrary, Carrizo and [H2O] agree that any litigation concerning or relating to this agreement and/or the relationship between the parties hereto shall be initiated and maintained in Harris County, Texas. The parties hereto, without reservation, consent to the exclusive and mandatory jurisdiction of the courts of Harris County, Texas, over any litigation concerning or relating to this agreement or the relationship between the parties to the same.

(*Id.* §§ 10.3, 10.7) (emphasis in original) (capitalization omitted); *see also* (Compl. ¶ 66.)

## 2. *Tracking Carrizo's Truck-Based Water Operations in Pennsylvania*

Around approximately September 2013, Carrizo introduced Drew Gladulich to H2O during an in-person meeting between Wilkerson and Mary Gilstrap ("Gilstrap"), who at all relevant times was H2O's Head of Operations and Environment. (Compl. ¶¶ 24, 74.) H2O

alleges Wilkerson went out of his way to ensure Gilstrap knew that Gladulich was a Carrizo employee. (*Id.* ¶ 75.) Wilkerson asked Gilstrap for Gladulich to have full access to Carrizo's data in the WaterTRAC database, resulting in Gladulich accepting H2O's Legal and Privacy Statement and the subsequent issuance of computer credentials to access the database. (*Id.* ¶¶ 76-77.) Following Gladulich's acceptance of the Legal and Privacy Statement, his computer credentials were used to access the WaterTRAC database nearly every day. (*Id.* ¶ 77.)

Between late 2013 and 2014, Gladulich would ask Gilstrap via a series of telephone calls about various basic aspects of the WaterTRAC database, including how to enter it and how to access and download information. (*Id.* ¶ 78.) In addition, every few months between 2013 and 2015, he would also ask Gilstrap detailed questions over the phone or in-person about the enhanced water tracking data in the WaterTRAC database. (*Id.* ¶ 79.) During these calls and meetings, Gladulich held himself out as "just a business person" with no understanding of technology or knowledge relevant to understanding the WaterTRAC database. (*Id.* ¶ 80.) Based on his representations, Gilstrap provided him with additional information to assist his understanding of the database and the underlying WaterTRAC event processing software used to create enhanced water tracking data. (*Id.* ¶ 81.) At times, she would also provide him with confidential and proprietary information about the WaterTRAC system because she believed he needed the information for Carrizo's internal benefit. (*Id.*)

In early 2014, H2O alleges Gladulich began feigning problems with the Carrizo data that H2O's system had gathered and been reported in the WaterTRAC database, in what H2O believed at the time was an effort to discredit it. (*Id.* ¶¶ 82-83.) To ensure that Gladulich fully understood why his allegations of problems with the WaterTRAC system and database were mistaken, Gilstrap provided him with even more information about the platform. (*Id.* ¶ 83.) For

example, on three or four occasions during the first few months of 2014, Gladulich requested to speak with Gilstrap over the phone to have her defend erroneous measurements and discrepancies between the data collected through the WaterTRAC platform and other third-party measurement sources, and he would then demand an explanation of H2O's system, data, and collection methods.  (*Id.* ¶ 84.)  To fully disprove Gladulich's unfounded accusations, Gilstrap would, at times, be "pressured" into providing confidential and proprietary details about the WaterTRAC hardware, system, and database.  (*Id.* ¶ 85.)

H2O pleads additional examples of Gladulich and others seeking information regarding confidential and proprietary information about the WaterTRAC platform.  One instance occurred when Gilstrap explained details about H2O's data collection units relating to the calibration and placement characteristics of its WaterTRAC water meters.  (*Id.* ¶ 86.)  She explained the water meters were calibrated on a specific schedule and that they were placed at specific locations along a pipeline because H2O discovered those locations enabled more accurate monitoring of water volume.  (*Id.*)  Another instance occurred in early 2014, when Wilkerson "demanded" via telephone that H2O audit the water tracking movements of a particular hydraulic fracturing job. (*Id.* ¶ 88.)  Gilstrap reviewed all of the relevant water movements using the data in the database and recognized that a few of the water transfers were not classified properly.  (*Id.* ¶ 89.)  She then corrected the classifications as part of her audit and presented the results of her audit at an in-person meeting with Wilkerson and Gladulich.  (*Id.* ¶¶ 89-90.)  At the meeting, she noted that the corrections would have been made anyway as part of H2O's normal review of data in the WaterTRAC database.  (*Id.* ¶ 90.)

"In another more egregious example," Gladulich demanded via telephone that Gilstrap explain the logic behind H2O's naming of water locations in the database to defend concerns

raised regarding the accuracy of H2O's data.  (*Id.* ¶ 94.)  In particular, Gladulich wanted to know

how H2O was able to identify "whether a particular water tracking location was a water pull

(pick up) or deposit (drop off/disposal)."  (*Id.*)  Gilstrap's explanation of the location naming

logic was significant because she provided Gladulich with information unknown to other H2O

customers "and provided him the ability to understand the power of that naming logic."  (*Id.* ¶

95.)  The naming logic "underlies [H2O's] organization of raw data in the WaterTRAC database

in conjunction with the WaterTRAC event processing software" and "is not readily identifiable

via the enhanced water tracking data actually provided to clients."  (*Id.* ¶ 96.)  It functioned to

allow H2O "to identify the location name, the purpose (*i.e.*, pick-up, drop-off, or disposal) of a

particular geo-location . . . whether the data point is associated with a pipeline, truck, storage

tank, well . . .[,]" and was created and maintained as H2O's own proprietary and confidential

information.  (*Id.*)

    In May 2014, an in-person meeting took place in Pennsylvania between Gilstrap,

Gladulich, and Wilkerson, in which Gladulich "mentioned that 'the shortcomings of the

WaterTRAC platform' would not be an issue anymore because the 'new water tracking system

would address it.'"  (*Id.* ¶ 99.)  At the end of the meeting, Wilkerson walked Gilstrap to her car

and told her that Gladulich had gone to Carrizo management and gotten approval to use another

water tracking system.  (*Id.* ¶ 100.)  Consequently, Wilkerson told her that Carrizo would no

longer need the WaterTRAC platform to monitor water moved by truck, but that Carrizo would

still use it to track pipeline water.  (*Id.*)  H2O did not doubt Carrizo's representation because

around May 2014, Jerry Murphy, an H2O employee who serviced H2O's equipment in

Pennsylvania, reported to Gilstrap that Carrizo started using a bar-code-based water tracking

system on its trucks in Pennsylvania.[5] (*Id.* ¶ 101.) Even though H2O lost Carrizo's truck-based water tracking business in Pennsylvania, their main business focus was on the pipeline-based water tracking product, which H2O continued to provide to Carrizo's pipeline operations in Ohio, Pennsylvania, and Texas. (*Id.* ¶ 103.)

### 3. *Tracking Carrizo's Pipeline Water Operations*

In the summer of 2014, Wilkerson asked H2O to consider hiring his son, Michael Wilkerson. (*Id.* ¶ 105.) By September 2014, H2O hired Michael Wilkerson to work for H2O in connection with services it was providing to Carrizo's South Texas operations. (*Id.*) Michael Wilkerson received training and took day-to-day direction from Herb Pavelka ("Pavelka"). (*Id.*)

In approximately October 2015, Pavelka mentioned to Gilstrap that Carrizo began installing secondary WaterTRAC flow meters within the same produced water pipelines that already had WaterTRAC flow meters installed, but at different locations in the pipeline. (*Id.* ¶ 107.) In particular, one flow meter was placed at the end of the pipeline and the other flow meter was placed at the opposite end. (*Id.*) Although the additional WaterTRAC flow meters were purchased from and installed by H2O, Carrizo maintained those meters. (*Id.*) Gilstrap followed up with the information Pavelka provided and was advised by Carrizo that the duplicate flow meters were installed to monitor for leaks, reasoning that the flow meter measurement at one end of the pipeline would match the flow meter measurement at the other end. (*Id.* ¶ 108.) Charles Keith ("Keith"), the President of H2O, then communicated to Wilkerson to advise him that the redundant flow meters were unnecessary to monitor for leaks because H2O's equipment and data could already provide that kind of information. (*Id.* ¶ 109.) Keith also advised Wilkerson that Carrizo should install pressure gauges if they were concerned with leaks, but Carrizo continued

---

[5] H2O alleges that after a reasonable period of discovery, it will show that Jerry Murphy was hired away from H2O and began to service and manage the bar-code water tracking system for trucks carrying Carrizo's water. (Compl. ¶ 102.)

to install the secondary flow meters anyway. (*Id.*) H2O's data collection units collected the meter data from the first and secondary WaterTRAC flow meters, which Carrizo was able to review in the WaterTRAC database. (*Id.* ¶ 110.) Shortly after the duplicate water meter data was collected, Carrizo complained that the measurements at one end of the pipeline did not match the measurements at the opposite end. (*Id.* ¶ 111.) Carrizo demanded a response, and Keith explained that deviations were to be expected, especially if there was a high level of salt or acid in the water or if the meters were not being serviced properly. (*Id.*)

In late October 2015, Pavelka began receiving documents via email called "GO" reports. (*Id.* ¶ 113.) Pavelka did not understand the information in the GO reports, so he forwarded a report to Gilstrap to seek her advice on how to understand it. (*Id.*) The email Pavelka forwarded to Gilstrap was also originally sent to Wilkerson, Gladulich, Michael Wilkerson, and Jeremy Manno ("Manno"), who was a Carrizo employee. (*Id.* ¶ 114.) The GO reports were sent from the email address of "reports@oilfieldtrackingservices.com," and they appeared to compare the data from the WaterTRAC database of pipeline readings taken by the first flow meter with readings taken by the secondary flow meters during the same time period. (*Id.* ¶ 113.)

After learning of the GO reports' existence, H2O began to investigate their source. (*Id.* ¶ 115.) Mark Hamby, an H2O employee, searched for information regarding "Oilfield Tracking Services" on the internet; and then Brian Bagby, another H2O employee, called OTS to ask general questions about the business and the services it offered. (*Id.*) During the conversation, an OTS representative informed Brian Bagby that OTS was monitoring Carrizo's pipeline operations in South Texas. (*Id.*) However, within an hour of that conversation, either Wilkerson or Gladulich called Brian Bagby and told him not to call OTS again. (*Id.* ¶ 116.) In late 2015, H2O's research uncovered that the owner of OTS was Thomas Gladulich, who is Drew

Gladulich's father.[6]  (*Id.* ¶ 117.)  H2O also discovered by reviewing OTS' website that OTS utilized a bar-code tracking system, which led H2O to realize that OTS was likely the company that Carrizo was using to track truck water movements, including the water tracking business H2O lost from Carrizo in Pennsylvania.  (*Id.*)  H2O alleges that the duplicate flow meters and GO reports were part of Defendants' scheme "to create a false comparison between [H2O's] WaterTRAC enhanced water tracking data which was recorded at two different locations to give the appearance that [H2O's] WaterTRAC product did not correctly track water."  (*Id.* ¶ 119.)

### 4.     *The Conclusion of the Alleged Scheme*

On March 31, 2016, Manno spoke as an employee and representative of Carrizo as part of a panel at the 6th Annual Marcellus & Utica Water Management 2016 Conference in Pittsburgh, Pennsylvania.  (*Id.* ¶ 120.)  The annual conference is attended by people across the oil and gas industry.  (*Id.*)  During his presentation, Manno stated that Carrizo had funded another fresh and produced water tracking system and wanted that system to become the industry standard.  (*Id.*)  He even offered to distribute Gladulich's business cards so that Gladulich could offer a detailed explanation of how the system worked.  (*Id.*)

In June 2016, Wilkerson called Keith and explained that Carrizo would no longer need H2O's services because Carrizo was developing an "in-house water tracking supervisory control

---

[6] OTS, Drew Gladulich, and Thomas Gladulich's Brief in Support of their Motion to Dismiss and Compel Arbitration provides additional details of the relationship between Carrizo and themselves.  In particular, Carrizo hired Drew Gladulich as an "independent contractor/consultant" in June 2011.  (OTS, Drew Gladulich, and Thomas Gladulich's Br. Supp. Mot. Dismiss & Compel Arbitration 2; *compare id.* (stating that Drew Gladulich was an "independent contractor/consultant" for Carrizo), *with* Compl. ¶ 75 (stating that Wilkerson went out of his way to ensure Gilstrap knew that Drew Gladulich was a Carrizo employee).)  Drew Gladulich is also currently the Vice President and 50% owner of OTS.  (OTS, Drew Gladulich, and Thomas Gladulich's Br. Supp. Mot. Dismiss & Compel Arbitration 2.)

Thomas Gladulich is a 50% owner of OTS, and he currently serves as Chief Executive Officer of the company.  (*Id.*)

Wilkerson is currently the Water and Drill Solids Manager at Carrizo.  (Wilkerson's Mem. Law Supp. to Join Carrizo's Mot. Dismiss Pl.'s Compl. to Compel Arbitration 2; *but see* OTS, Drew Gladulich, and Thomas Gladulich's Br. Supp. Mot. Dismiss & Compel Arbitration 2 (stating that Wilkerson is currently the Water, Drilling, and Water Transportation Manager at Carrizo).)

and data acquisition ('SCADA') system to track water in pipelines." (*Id.* ¶ 121.)  H2O alleges that Wilkerson made a point of telling Keith that a third party was not replacing H2O.  (*Id.*)  In reliance on Wilkerson's representation, H2O agreed to sell Carrizo certain support equipment, such as "electrical panel boxes, solar panels, batteries, breakers, flow meter trailers, four-inch flow meters and antennas." (*Id.*)  Around the same time, and after Carrizo terminated H2O's services, Carrizo hired Pavelka to work on its South Texas operations, but H2O was unaware of the hiring.  (*Id.* ¶ 123.)  Thus, Pavelka continued to work for and receive compensation from H2O until H2O discovered his dual role in late June 2016 when a supply company notified H2O that it had seen Pavelka driving a Carrizo-owned truck.  (*Id.*)

H2O claims that it was finally the combination of Manno's March 2016 statements at the conference about Carrizo's new industry standard; Carrizo's June 2016 termination of H2O; Carrizo's June 2016 installation of a new bar-code pipeline tracking system in South Texas; and Carrizo's June 2016 hiring of Pavelka that tipped H2O off that OTS had replaced them and not some internal Carrizo water tracking system as had been represented earlier.  (*Id.* ¶ 124.)  The combination of events also led H2O "to consider the possibility that its entire relationship with Carrizo may have been part of a scheme to defraud [H2O] of its trade secrets[] and confidential and proprietary information to enable Carrizo, through its partner OTS, to develop an oilfield water tracking system" to sell to the entire oil and gas industry.  (*Id.* ¶ 125.)

### 5.    *H2O's Discoveries Post-Carrizo Relationship*

In light of its realizations, H2O conducted an audit of Carrizo's data in the WaterTRAC database.  (*Id.* ¶ 126.)  The results showed that Gladulich was "dumping entire months' worth of not only Carrizo's raw data, but also [H2O's] proprietary organization of that raw data, and

[H2O's] enhanced water tracking data from the WaterTRAC database, one month at a time, for several months prior to Carrizo's June 2016 termination of its relationship with [H2O]." (*Id.*)

H2O also learned that around approximately October 24, 2013, Thomas Gladulich prepared and filed a provisional patent titled, "A Fluid Moving Tracking System, Especially Suitable for Water Produced in Connection with Oil and Gas Well Operations." (*Id.* ¶ 129, Ex. B.) In addition, H2O contends that one or more of Defendants directed that a non-provisional patent be filed on approximately October 24, 2014 based on the provisional patent previously mentioned. (*Id.* ¶ 130, Ex. C.) "Although the published version of the patent application does not disclose it," the United States Patent and Trademark Office's PAIR system records shows that both the provisional and non-provisional patent applications were associated with the internal attorney docket registration, "CARRIZO, confirming that the patent applications were filed in conjunction with [Carrizo]." (*Id.*) H2O alleges the provisional and non-provisional patent applications relied on, referenced, and "even incorporated water tracking information collected from the same areas tracked by [H2O] as early as August 1, 2013, including pickup and delivery location, water type, [and] number of gallons of water collected and delivered." (*Id.* ¶ 132.)

In sum, H2O alleges it invested millions of dollars developing its WaterTRAC platform and that Defendants' scheme "caused the end of [its] business." (*Id.* ¶ 22.) On March 16, 2018, it filed a thirteen-count Complaint alleging the following causes of action: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*; (2) conspiracy to violate RICO; (3) violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*; (4) violation of the Pennsylvania Uniform Trade Act, 12 Pa. Cons. Stat. §§ 5301 *et seq.*; (5) Oklahoma fraud and deceit; (6) Pennsylvania fraud and deceit; (7) violation of the Oklahoma

Deceptive Trade Practices Act, Okla. Stat. tit. 78, §§ 51 *et seq.*; (8) Oklahoma civil conspiracy; (9) Pennsylvania civil conspiracy; (10) Oklahoma unfair competition; (11) Pennsylvania unfair competition; (12) conversion and misappropriation of business and confidential information; and (13) unjust enrichment (incorrectly designated Count XII).[7]

On April 27, 2018, Carrizo filed the instant Motion to Dismiss to Compel Arbitration or, Alternatively, to Transfer Venue (which Wilkerson subsequently joined in full on May 18, 2018). That same day, OTS, Drew Gladulich, and Thomas Gladulich filed a similar Motion that seeks only to dismiss the Complaint and compel arbitration.

## II.    LEGAL STANDARD

Motions to compel arbitration can be decided under a motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or a motion for summary judgment standard under Federal Rule of Civil Procedure 56. *MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 732 (E.D. Pa. 2013) (citing *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771-76 (3d Cir. 2013)). When the arbitrability of claims is apparent on the face of the complaint or documents relied upon in the complaint, then motions to compel arbitration should be resolved under Rule 12(b)(6). *See Guidotti*, 716 F.3d at 774. On the other hand, when the party resisting arbitration "has come forth with reliable evidence that is more than a 'naked assertion . . . that it did not intend to be bound' by the arbitration agreement, even though on the face of the pleadings it appears that it did[,]" then the Rule 56 standard is appropriate because the party is entitled to discovery on the issue of whether there was a valid agreement to arbitrate. *Id.* at 774-75 (ellipses in original) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 55 (3d Cir. 1980)).

---

[7] All counts are asserted against all Defendants except Count VII (violation of the Oklahoma Deceptive Trade Practices Act), which is brought against OTS only.

In this case, all of the parties agree that Rule 12(b)(6) is the appropriate standard, and we will thus analyze Defendants' Motions accordingly. A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)). However, courts need not "accept mere[] conclusory factual allegations or legal assertions." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 678-79). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555. Finally, we may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Davis*, 824 F.3d at 341 (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).[8]

III.    **DISCUSSION**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir.

---

[8] H2O quoted portions of the MSAs in its Complaint, but it did not attach the agreements as exhibits. (*See, e.g.*, Compl. ¶ 66) (quoting the MSAs). Defendants have submitted the MSAs in reliance on their Motions, and H2O does not dispute their authenticity. Therefore, we will consider the MSAs in deciding Defendants' Motions. *See Davis*, 824 F.3d at 341 (citation omitted).

2009).  Congress designed the statute "to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration."  *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 83-84 (3d Cir. 2010) (quoting *Century Indem.*, 584 F.3d at 522).  "In particular, the FAA provides that as a matter of federal law '[a] written provision' in a maritime or commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract.'"  *Century Indem.*, 584 F.3d at 522 (quoting 9 U.S.C. § 2).

A motion seeking to compel arbitration requires a two-step analysis in resolving the inquiry.  *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014) (citing *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998)); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citation omitted); *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (citation omitted).  First, we must decide whether there is a valid agreement to arbitrate.  *CardioNet*, 751 F.3d at 172; *Kirleis*, 560 F.3d at 160.  In determining the validity of an arbitration agreement, we look to "ordinary state-law principles that govern" contract formation.  *Kirleis*, 560 F.3d at 160 (quoting *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see also Lenox Corp. v. Blackshear*, 226 F. Supp. 3d 421, 432 n.10 (E.D. Pa. 2016).  The second step of the inquiry involves determining whether "the particular dispute falls within the scope of that agreement," the analysis of which federal law governs.  *Kirleis*, 560 F.3d at 160 (providing the second step of the framework) (citation omitted); *Lenox*, 226 F. Supp. 3d at 432 n.10 (stating federal law governs the issue of whether a dispute falls within the scope of an arbitration agreement).  Although the FAA creates

a presumption of arbitrability, the presumption does not apply at step one of our inquiry; it only applies at step two.[9] *See Century Indem.*, 584 F.3d at 524 (quoting *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003)); *Lenox*, 226 F. Supp. 3d at 428 (citing *Kirleis*, 560 F.3d at 160).

### A. Validity of the Arbitration Agreement

Our analysis begins with determining whether the parties entered into a valid arbitration agreement, under which ordinary state law principles apply. *See Lenox*, 226 F. Supp. 3d at 432 n.10. Texas law governs the terms and provisions of the 2014 MSA. (*See* 2014 MSA ¶ 10.7.) The elements of a valid contract under Texas law consist of "(1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App. 2010) (citing *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555-56 (Tex. App. 2002)).

This prong requires very little discussion, as H2O has pleaded that it entered into the 2014 MSA with Carrizo (Eagle Ford) LLC, which also covered Carrizo. (Compl. ¶ 65) ("[T]here was also an MSA executed in 2014 between [H2O] and Carrizo (Eagle Ford) LLC. . . . The 2014 MSA also covered affiliates of Carrizo (Eagle Ford) LLC, which would have included Carrizo."). Moreover, H2O does not dispute the validity of the 2014 MSA or the arbitration

---

[9] Prior to engaging in the two-step analysis set forth above, H2O would add a threshold question of whether the MSAs even cover the dispute. Of course, H2O answers that question in the negative and adds that even if the MSAs do cover this dispute, then arbitration is still not appropriate because the dispute falls outside the scope of the arbitration clause.

We will conduct our analysis in accordance with the framework described above in the text because H2O's threshold question is subsumed within the second prong. If there is a valid agreement to arbitrate, a court must determine whether the dispute falls within the scope of the arbitration clause. *See Kirleis*, 560 F.3d at 160. The operative arbitration provision in this case provides that "[i]f a dispute, claim or controversy arises out of, in connection with, or results from the performance of *this agreement*, or the breach thereof . . ." (2014 MSA § 10.3) (emphasis added). Thus, the scope of the arbitration clause is defined in terms of the scope of the agreement, and we will analyze H2O's argument within the second step of the framework.

provision contained within it.  (*See* Pl.'s Resp. Opp'n to Carrizo's Mot. Dismiss to Compel Arbitration or Transfer Venue 12.)  Accordingly, the arbitration agreement in the 2014 MSA is valid.

### B.      Scope of the Arbitration Clause

The crux of the parties' dispute centers on whether H2O's claims fall within the scope of the arbitration clause.[10]  At this stage, "there is a strong presumption in favor of arbitration, and doubts 'concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Gay v. CreditInform*, 511 F.3d 369, 387 (3d Cir. 2007) (quoting *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir. 1997)); *see also Lenox*, 226 F. Supp. 3d at 432 (stating there is "[a] presumption in favor of arbitrability . . . when the court investigates the scope of an arbitration clause") (citing *Century Indem.*, 584 F.3d at 524)).  The presumption is rebutted "only . . . with 'positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  *Lenox*, 226 F. Supp. 3d at 432 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).  There are two methods in which a party resisting arbitration can establish its burden of "positive assurance": (1) showing the "existence of 'an[] express provision excluding [the] grievance from arbitration'; or (2) provid[ing] 'the most forceful evidence of a purpose to exclude the claim from arbitration.'"  *Lukens Steel Co. v. United Steelworkers of Am. (AFL-CIO)*, 989 F.2d 668, 673 (3d Cir. 1993) (quoting *AT & T Techs.*, 475 U.S. at 650) (first and second alterations in original).

---

[10] All of the parties rely on Texas law and the United States Court of Appeals for the Fifth Circuit's interpretation of Texas law in their analyses of the scope of the arbitration clause.  However, state law principles of contract apply only when a court must determine whether a valid agreement to arbitrate exists.  *See Lenox*, 226 F. Supp. 3d at 432 n.10.  When a court reaches the second step of the framework—the scope of the arbitration clause—it applies federal substantive law.  *See Century Indem.*, 584 F.3d at 524 (quoting *China Minmetals*, 334 F.3d at 290) ("Inasmuch as 'federal law applies to the interpretation of arbitration agreements,' once a court has found that there is a valid agreement to arbitrate . . . the determination of whether 'a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law.'").  Accordingly, we will rely on Third Circuit precedent in determining the scope of the arbitration clause at issue.

Although "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), the United States Court of Appeals for the Third Circuit "has held that 'positive assurance' does not mean 'absolute certainty,'" *Lenox*, 226 F. Supp. 3d at 433 (citing *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 513 (3d Cir. 1990), *overruled on other grounds by Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002)). Indeed, "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." *Gay*, 511 F.3d at 387 (quoting *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001)). We must determine the scope of the arbitration clause by looking to the facts underlying the claims, rather than the legal theories alleged in the complaint. *Lenox*, 226 F. Supp. 3d at 433 (citing *Medtronic*, 247 F.3d at 55).

The arbitration agreement in the 2014 MSA provides that "[i]f a dispute, claim or controversy *arises out of, in connection with, or results from* the performance of this agreement, or the breach thereof," then the parties agree to first mediate the dispute and will then proceed to arbitration if the dispute remains unresolved. (2014 MSA § 10.3) (emphasis added). The arbitration clause is broad because phrases such as "arises under" and "arising out of" are normally given broad construction when they appear in arbitration provisions. *Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000). Defendants claim this dispute falls within the scope of the arbitration agreement because all of H2O's allegations pertain to services that H2O was providing under the 2014 MSA. (*See* Carrizo's Mem. Law Supp. Mot. Dismiss to Compel Arbitration or Transfer Venue 13; OTS, Drew Gladulich, and Thomas Gladulich's Br. Supp. Mot. Dismiss & Compel Arbitration 7.) H2O responds by arguing the 2014 MSA does not cover the instant dispute, but rather its Legal and Privacy Statement is the operative agreement. (Pl.'s

Resp. Opp'n to Carrizo's Mot. Dismiss to Compel Arbitration or Transfer Venue 13-20.)

Alternatively, H2O argues that even if the 2014 MSA does cover the dispute, the parties clearly

intended for the arbitration clause to be narrow in scope so as not to include H2O's allegations of

misappropriation of trade secrets and proprietary and confidential information. (*Id.* at 20-21.)

We agree with Defendants and will order the alternative dispute resolution procedures as

bargained for in the 2014 MSA.[11] In seeking to avoid arbitration, H2O argues that its allegations

fall outside of the services provided for under the 2014 MSA. The 2014 MSA states that

> [f]rom time to time, Carrizo may contract with [H2O] for the
> performance of work or the provision of services, which may
> include the furnishing, sale, lease or rental labor, equipment,
> vehicles, tools, instruments, materials, supplies, goods, machinery
> or other products (collectively, "*Materials*" and, together with such
> work performed or services provided, "*Services*"), and [H2O]
> desires to provide such Services to Carrizo, in accordance with the
> terms and conditions of this agreement.
>
>          \*       \*       \*
>
> 1.    **Scope**. This agreement controls and governs all Services
> performed and Materials supplied by [H2O] for Carrizo under
> verbal or written work orders, purchase orders, delivery tickets,
> field tickets, job tickets, invoices or other verbal or written
> agreement of similar effect issued from or approved by Carrizo
> ("*Work Order*").

(2014 MSA at 1, § 1) (emphasis in original). H2O claims that it provided the services called for

under the 2014 MSA, which "were limited to [its] service of Carrizo's water tracking equipment

to enable Carrizo to track and report on its water movements" and "collect[ing] and provid[ing]

Carrizo with access to its raw water tracking data." (Pl.'s Resp. Opp'n to Carrizo's Mot. Dismiss

---

[11] As we indicated above in the margin, because the scope of the arbitration clause is defined in terms of disputes or claims that "arise[] out of, in connection with, or result[] from the performance of *this agreement*[,]" H2O's contention that the 2014 MSA does not apply is sufficiently answered in the second prong of the arbitration analysis. In other words, the scope of the arbitration clause is defined in terms of the scope of the agreement. Thus, a facial finding that the claims fall within the scope of the arbitration clause would necessarily mean the claims fall within the agreement as a whole. A separate analysis of each question would be redundant. Accordingly, we will address H2O's argument that the 2014 MSA does not apply to this matter in the context of the scope of the arbitration clause.

to Compel Arbitration or Transfer Venue 1.)  It then attempts to draw a distinction between the aforementioned services and certain "value-added services" that it also provided to Carrizo.  (*Id.* at 1-2.)  H2O argues that the value-added services, such as "process[ing] the raw water tracking data with its WaterTRAC event processing software into enhanced water tracking data; stor[ing] the enhanced water tracking data; and occasionally explain[ing] the workings of the WaterTRAC database to help Carrizo understand and confirm the validity of its raw water tracking data[,]" was covered by the Legal and Privacy Statement and forms the basis of the instant dispute.  (*Id.*)

H2O attempts to draw too much of a distinction between the services provided under the 2014 MSA and the "value-added services" it additionally provided to Carrizo.  Several reasons lead the Court to conclude that H2O's allegations fall within the scope of the 2014 MSA's arbitration clause.  H2O pleads that it "is involved in the business of water data tracking and water data management" and developed the WaterTRAC platform to engage in its business. (Compl. ¶¶ 2, 43.)  It further alleges that the "typical scope of services provided . . . relating to the sale of [the] WaterTRAC platform services included[,]" *inter alia*, "user-training and *WaterTRAC database access* for a limited number of authorized employees of [H2O's] clients." (*Id.* ¶ 49) (emphasis added).  Indeed, all companies that purchased H2O's services were also provided with the ability to access the WaterTRAC database.  (*Id.* ¶ 59.)  Those companies would then be permitted to designate certain individuals to access their company's water tracking data within the database, and "[H2O] would answer questions about the *enhanced water tracking data and WaterTRAC database* to assist the authorized individuals in understanding their company's water tracking data."  (*Id.*) (emphasis added).  Thus, H2O has specifically pleaded that its clients' inquiries about the enhanced water tracking data (what it calls a "value-added service") is within the scope of services that it would provide.  Further, its allegations are

22

all premised on the contention that Carrizo (and other Defendants) utilized the services under the MSAs to gain access to information that H2O considered to be proprietary, confidential, and constituting its trade secrets. In other words, the alleged misappropriation of trade secrets and confidential information necessarily flows from the services that H2O was providing to Carrizo. Therefore, the alleged theft of this information undoubtedly is at least "in connection with" the performance of the services that H2O was providing under the MSAs.

H2O's allegations are also based on the fact that numerous individuals improperly requested data and information about the WaterTRAC platform to develop a competing product and company. (*See* Compl. ¶¶ 78-96) (noting specific requests by Gladulich and Wilkerson for information about apparent problems with Carrizo's water data). All companies that purchased H2O's services were able to access the WaterTRAC database, and H2O would answer questions about the companies' enhanced water tracking data and the database itself. (*Id.* ¶ 59.) Thus, Gladulich and Wilkerson's specific requests for information may properly be construed as "verbal work orders," necessitating the conclusion that the alleged scheme to defraud and misappropriate H2O of its trade secrets and confidential information is in connection with the services H2O was providing under the 2014 MSA. (*See* 2014 MSA § 1) (defining the scope of the agreement).

H2O's next argument is that even if the 2014 MSA does apply to this dispute, then its allegations are outside the scope of the arbitration clause because the parties used limiting language to exclude tort claims. (Pl.'s Resp. Opp'n to Carrizo's Mot. Dismiss to Compel Arbitration or Transfer Venue 20-21.) In particular, H2O claims the arbitration clause is narrow because it requires that arbitration be conducted "before a single arbitrator with expertise in the subject matter of this contract." (2014 MSA § 10.3.) Thus, H2O's position is that the arbitration

clause excludes torts, especially torts involving the theft of confidential and proprietary information and trade secrets. (Pl.'s Resp. Opp'n to Carrizo's Mot. Dismiss to Compel Arbitration or Transfer Venue 21.)

We may dispose of this argument quickly. In deciding whether claims fall within the scope of an arbitration clause, we must look only to the facts underlying the claims and not the actual legal theories themselves. *Lenox*, 226 F. Supp. 3d at 433 (citing *Medtronic*, 247 F.3d at 55); *see also Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 384 (11th Cir. 1996) ("The law is clear that tort claims and claims other than breach of contract are not automatically excluded from a contractual arbitration clause."). Therefore, the fact that H2O has pleaded torts, rather than claims of breach of contract, is irrelevant in determining whether the claims are within the scope of the arbitration clause.

As noted above, when a court examines the scope of an arbitration clause, there is a strong presumption in favor of arbitrability, and all doubts should be resolved in favor of arbitration. *Century Indem.*, 584 F.3d at 524; *Gay*, 511 F.3d at 387 (quoting *Great W.*, 110 F.3d at 228). H2O can rebut this presumption "only . . . with 'positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Lenox*, 226 F. Supp. 3d at 432 (quoting *AT & T Techs.*, 475 U.S. at 650). Such positive assurance can be shown if there exists an express provision that excludes the grievance from arbitration, or there is "the most forceful evidence of a purpose to exclude the claim from arbitration." *Lukens Steel*, 989 F.2d at 673 (quoting *AT & T Techs.*, 475 U.S. at 650).

There is no express provision excluding H2O's claims from the arbitration clause. Resolving all doubts in favor of arbitration, we cannot say with positive assurance that the broad arbitration clause in the 2014 MSA is not susceptible to an interpretation that does not cover the

instant dispute. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) ("Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'") (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995)). As discussed above, Carrizo and other Defendants were allegedly able to use the very services under the MSAs to misappropriate H2O's trade secrets and proprietary and confidential information. Accordingly, such allegations are at least "in connection" with the performance of the agreement, and H2O has not presented forceful evidence to overcome the presumption of arbitrability.

### C.      All Defendants are Subject to the Arbitration Clause

Now that we have determined that H2O's claims must be arbitrated, we must now decide which Defendants H2O must arbitrate against. Only H2O and Carrizo were covered under the 2014 MSA. However, under Texas law, nonparties to an agreement may enforce arbitration against a party to the agreement "when the signatory to the contract containing a[n] arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2006) (citing *Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 348 (5th Cir. 2002)).

In this case, H2O concedes that the non-signatory Defendants (OTS, Drew Gladulich, Thomas Gladulich, and Wilkerson) to the 2014 MSA may enforce the arbitration clause. (Pl.'s Resp. Opp'n to OTS, Drew Gladulich, and Thomas Gladulich's Mot. Dismiss & Compel Arbitration 18-20.) Indeed, H2O alleges that "Defendants[] conspired together and with great

aforethought and malice[] orchestrated a scheme to defraud [H2O] of its trade secrets, proprietary data and confidential information." (Compl. ¶ 17.) Accordingly, we will order all of the parties to engage in the alternative dispute resolution procedures as stated in § 10.3 of the 2014 MSA. (*See* 2014 MSA § 10.3) (providing first for mediation and then arbitration if the dispute cannot be resolved).

### D. Stay or Dismiss the Case

Section 3 of the FAA provides that if a court determines the pending suit is referable to arbitration, then it "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. The Third Circuit has stated that "the plain language of § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration." *Lloyd v. HOVENSA, LLC.*, 369 F.3d 263, 269 (3d Cir. 2004).

In this case, neither H2O nor any of the Defendants have applied for a stay pending arbitration. We will therefore dismiss H2O's Complaint and close this matter. *See Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 490 (E.D. Pa. 2011).

## IV. CONCLUSION

H2O has not overcome the presumption of arbitrability by pointing to an express provision in the agreement or other forceful evidence to show a purpose to exclude its allegations from arbitration. Further, we will order the alternative dispute resolution procedures as to all Defendants because H2O alleges Defendants engaged in interdependent and concerted

misconduct.  Accordingly, Defendants' Motions are granted, and H2O's Complaint is dismissed without prejudice.[12]

An appropriate Order follows.

---

[12] Because the Court is ordering the parties to engage in the alternative dispute resolution procedures as set forth in the 2014 MSA, we need not address the issue of transfer of venue.